ZAMMIT et al., Appellants,

v.

**SOCIETY NATIONAL BANK, Appellee.**

[Cite as *Zammit v. Soc. Natl. Bank* (1996), 115 Ohio App.3d 543.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L-95-175.

Decided Nov. 8, 1996.

544

*J. Stephen Teetor* and *Mark Landes,* for appellants.

*Daniel R. Warren,* for appellee.

*Per Curiam.*

This is an appeal from a directed verdict granted by the Lucas County Court of Common Pleas to appellee, Society National Bank. The appellants in this case are three individual investors, Ernest J. Zammit, George S. Wade, Sr., George S. Wade, Jr., and two companies they formed, Wazam, Inc., and The Reuben Company. The companies were formed to furnish and market an exclusive condominium project in an area of Toledo, Ohio, known as the "Middlegrounds."

Appellants have presented two assignments of error, which are:

*"Assignment of Error No. 1*

"The trial court erred in directing a verdict in favor of defendant."

*"Assignment of Error No. 2*

"The trial court erred in excluding the following evidence offered by the plaintiffs.

"A. All reference to the July 11, 1989 letter from the bank to the city of Toledo, including deleted portions of Mr. Shannon's videotaped deposition.

"B.  Tim Wade's testimony as to what the bank told others who inquired about the status of MDC's loan, to which testimony no objection was raised by defendant.

"C.  Tim Wade's testimony that funds were distributed by the bank that were not within MDC's loan budget."

As this court has previously stated:

"In reviewing a ruling on a motion for a directed verdict, we are guided by the following standard of review:

" '[I]f all the evidence relating to an essential issue is sufficient to permit only a conclusion by reasonable minds against a party, after construing the evidence most favorably to that party, it is the duty of the trial court to instruct a finding or direct a verdict on that issue against that party.' " *Phillips v. Mufleh* (1994), 95 Ohio App.3d 289, 293, 642 N.E.2d 411, 414.

The standard employed by this court is the same standard that guides a trial court considering a motion for a directed verdict. *Donaldson v. Northern Trading Co.* (1992), 82 Ohio App.3d 476, 480, 612 N.E.2d 754, 756.  Keeping this standard in mind, we now review the evidence presented at trial.[1]

Appellant George S. Wade, Jr., testified that he and two other individuals decided to pursue an idea to build and develop condominiums, with landscaping and a yacht club, in downtown Toledo, Ohio.  Three companies [2] with which the three individuals were associated gave money to fund a marketing analysis.

The marketing analysis showed that individuals would be interested in purchasing condominiums in downtown Toledo, Ohio.  Later marketing analysis studies helped to define the size, features, and price ranges of the condominiums.

The information gained from the studies was shared with Toledo Trust Company, the predecessor bank to appellee Society National Bank ("the bank").

---

1.  Our review of the evidence presented at trial will not include the videotape deposition testimony of the bank loan officer, David Shannon, even though the transcript shows that the videotapes were played at trial.  Appellants did not comply with the following provisions of App.R. 9(A): "When the transcript of proceedings is in the videotape medium, counsel shall type or print those portions of such transcript necessary for the court to determine the questions presented, certify their accuracy, and append such copy of the portions of the transcripts to their briefs."  In this case, the trial transcript shows that the trial court ruled on objections from the parties and excluded some portions of the testimony.  The court referred to page and line numbers to identify the portions of testimony that were excluded, but no transcript has been provided to this court to permit us to look at the pages and line numbers to verify what was excluded at trial.  See *State v. Ebright* (1988), 47 Ohio App.3d 123, 125, 547 N.E.2d 1002, 1003.

2.  The three companies were Raytomco;  Lathrop, a general contractor;  and SSOE, an engineering and architectural firm.

The three companies who originally funded the studies were now joined by a new partner.[3] The partners located a developer from California who was willing to pursue the project. The partners did some research to verify that the developer had already successfully completed projects that involved building housing in an urban area with "some kind of a water-related amenity package * * *."

The developer and the original partners formed a limited partnership company known as the "Middlegrounds Development Company." A shell corporation organized by the developer served as the general partner. The other original partners became limited partners with the shell corporation.

Appellee The Reuben Company was a limited partner with exclusive rights to market the condominium units and the responsibility to supply furniture for five model units. Another limited partner had the right to act as the general contractor and the responsibility to build the units, put in roads, sewer, water, and to build a lake. A third limited partner was responsible for engineering. A fourth limited partner provided legal counsel to the limited partnership. In addition, the city of Toledo sold the land to the limited partnership, approved the project, and made certain commitments for loans if requirements were met by the limited partnership.

Because the limited partners were all long-standing customers of the bank, had business relationships with the bank and with various bank officers, and because the bank had a reputation for investing in the development of downtown Toledo, the limited partners introduced the developer to the bank to seek a loan to finance the construction of the condominiums. The bank loaned the Middlegrounds Development Company $7.7 million.

A subchapter S corporation, appellant Wazam was formed to borrow $500,000 from the bank in order to fulfill the obligations of appellant The Reuben Company to purchase furniture for five model units and to market the Middlegrounds project. The three individual appellants made personal guarantees to back the loan taken out by appellant Wazam. Appellant George S. Wade, Jr., testified that if the bank had not made the $7.7 million loan to the Middlegrounds Development Company, appellant Wazam would never have borrowed $500,000 from the bank in a separate loan, since the money was needed only to market condominium units that were actually built. He also testified that the loan to appellant Wazam was approved before the bank approved the loan to the Middlegrounds Development Company, but Wazam delayed closing the loan until the bank approved and closed the loan to the Middlegrounds Development Company and until Wazam received a copy of a letter of intent that outlined the terms of the loan the bank made to the Middlegrounds Development Company.

---

3. The new partner was Marshall Melhorn, a law firm.

He testified that the letter of intent was provided to Wazam by the attorney for the Middlegrounds Development Company, and that the letter was copied to the bank's loan officer.

He stated that the contents of the letter showed that the bank proposed to loan Middlegrounds Development Company $4 million for the acquisition and development of the land, and a revolving line of credit in excess of $3 million for construction. The letter stated that the developer and his wife agreed to personally guarantee $2 million of the $7 million plus loan, and that the developer was required to deposit $1 million in cash equity with the bank at the time the loan was closed.

Both loans were closed by June 1988. Appellants installed a doublewide sales trailer at the construction site and staffed it with personnel and scale models. By January or February 1989, appellants entered into contracts with ten to twelve customers for the purchase of a unit once the units were built. Some contracts were subsequently cancelled because the prospective purchasers had hardships or were moving away from the area.

In April 1989, appellee Wazam asked the bank for an additional loan of $185,000 to pay for some cost overruns. The bank refused the loan request and informed Wazam that the personal signatures of the three individual investors in Wazam were no longer deemed sufficient to guarantee the original $500,000 loan. The bank required some security to be posted for the $500,000 loan.

The model units opened in June or July 1989. Personnel from the bank made regular inspections of the construction during this time period and never told appellants there were serious problems with the project. In August 1989, the city of Toledo passed an ordinance to provide $1 million for break wall repairs, for the cleanup of a creek, and to design a public park included in the development.

The first fifty-seven display condominiums were not completed until the end of 1989 because of construction delays encountered when old foundations were discovered on the property that had to be broken up and removed. Appellants noted that the developer "was becoming less interested in the project." Construction of the units slowed, and the developer wanted to replace the general contractor. Appellants sought information from the developer about the status of the project's financing. He responded by giving appellants permission to get information from other parties.

In response to appellants' questions in late November 1989, the general contractor stated that the bank denied some of its loan draw requests. Appellant George S. Wade, Sr., and an accountant then went to an office in Florida and reviewed the books of the Middlegrounds Development Corporation. Following

the review of the books and records, appellants contacted a loan officer of the bank in December 1989 to report that they learned (1) the developer never posted $1 million in cash at the time the loan was closed; instead, he paid himself and companies he controlled in excess of $650,000; and (2) the developer "had paid exorbitant fees to himself and to his architect partners." The loan officer responded that the bank would have to conduct its own audit to verify the information appellants told her.

In the spring of 1990, appellants were still attempting to market the condominiums. The general contractor left the project. Appellants and the developer began meeting with the bank for the purpose of reaching a workout plan that would allow the project to continue. The original partners were interested in reforming and renegotiating with the bank to complete the project without any further participation by the developer. The original partners presented three or four proposals, but the bank rejected them all. The original partners then located a new potential partner that was willing to invest $1.5 million to keep the project viable. The bank turned down the offer. The potential partner then proposed a plan to invest $2 million, while sharing the risk with the bank. The bank refused that offer and tried to revive the original offer for $1.5 million. The potential partner would not renew the original offer.

In March 1990, a bank representative who was a "workout expert" and who specialized in saving failing loans told appellant George S. Wade, Jr., "that he was tired of seeing me, that they were tired of analyzing our analysis, and he basically threw me out of the bank." When appellant George S. Wade, Jr., reminded the bank representative that appellants were long-standing customers of the bank who were motivated to reach a solution that would save them great financial loss, the representative indicated he did not care about appellants' financial loss.

The bank filed a foreclosure action against the Middlegrounds Development Company, and the control and maintenance of the property was awarded to the bank. In May 1990, the bank appointed a receiver to control the asset.

Appellant George S. Wade, Jr., took control of the office records of the Middlegrounds Development Company that were abandoned at the development site. He took them home and reviewed them for a year. His review confirmed that the developer had not posted $1 million in cash for equity at the time the loan to the Middlegrounds Development Company was closed, but that the developer presented invoices for cost expenditures associated with the project instead. Many of the invoices were from companies owned by the developer, some were from appellants. Appellant George S. Wade, Jr., testified that the invoices from appellants were never paid by the developer.

Appellant George S. Wade, Jr., testified that after his review of the records from the Middlegrounds Development Company, he sought documents from the

bank regarding the loan to the developer. He learned that as early as September 6, 1988, the loan officer at the bank wrote interoffice correspondence noting there was " 'No evidence of a letter of credit or Certificate of Deposit in the amount of one million dollars.' " Appellants had invested $200,000 in the project by that date. By April 13, 1989, the bank stated in a Watchlist Status Report that if sales did not materialize in the next six months, the bank should "end our commitment for financing and start liquidation." Appellant George S. Wade, Jr., testified that the bank never informed appellants of any misgivings at that time.

In a letter dated April 27, 1989, the bank informed the developer that it would not make any more cash advances on the loan until the developer provided the bank with a list of updated costs. Appellant George S. Wade, Jr., testified that appellants had no knowledge of the potential funding problems for the project in April 1989.

By July 5, 1989, the bank noted an expected loss of $2 million. Appellants were not aware of that assessment and continued to invest their money in the project. On November 3, 1989, the bank sent a letter to the Middlegrounds Development Company informing the company that a one-percent annual loan fee was not fully paid.

Documents from the bank showed that the Overhead General and Administrative, Project Management, and Finance Fee portions of the budget for the loan to the Middlegrounds Development Company were completely depleted in April 1989; the project had three and a half years left until the expected completion date. The model condominiums were not yet open because extensive construction remained to be completed on the first eleven units from an expected total of ninety units. By the time the project failed, appellants had invested principal in the amount of $790,356 through appellant Wazam.

On cross-examination, appellant George S. Wade, Jr., admitted that appellants had the right to get information at any time during the project from Middlegrounds Development Company about the loan from the bank. He also admitted that appellants had no financial liability for the loans from the bank to the Middlegrounds Development Company. He conceded that his company had no previous experience with sales of residential real estate, that he fired a salesman in November 1988 because he was dissatisfied with the pre-sales of the condominiums, that the remaining salesman had three months of experience and that salesman left the company in June 1989. In July 1989, appellants had a salesman who was commuting from Florida to Toledo. The commuting salesman was hired full time in August 1989.

Appellant George S. Wade, Jr., also testified on cross-examination that he understood the loan to the Middlegrounds Development Company was a revolving loan, i.e., money was given to the borrower by the bank for use on expenses

related to the project and in turn sales of the completed project funded commissions to the broker, payment to the developer, and repayment of the loan principal. He conceded that the discovery of old foundations on the building site was a surprise to all that resulted in unexpected construction costs and delays. He conceded that a pond built on the project to help sell the idea of a lifestyle community became a liability rather than an asset, because it kept draining and generally had a muddy appearance. He also conceded that he was aware that because of rising interest rates in 1989, several downtown projects began to encounter financial difficulties and the bank announced that it would no longer lend money for downtown projects.

He testified that while he served on various boards with different officers from the bank, he never asked any of the officers to keep him informed about the status of the loan to the Middlegrounds Development Company. In addition, none of the bank officials ever offered to keep appellants apprised about the status of the loan to the Middlegrounds Development Company. Appellants never asked the bank for the letter of intent associated with the loan to the Middlegrounds Development Company, never confirmed with the bank after the loan closed that the closing complied with the terms described in the letter of intent, and never asked for or received a copy of the loan.

In October 1989, a meeting was held at the bank. The developer and appellants were present at the meeting. Appellants learned that the developer owed money for interest on the loan, that the budget was insufficient for the acquisition and construction of the planned yacht club, and learned that the loan would need to be revised. On October 27, 1989, appellant George S. Wade, Jr., wrote a letter on letterhead from appellant Reuben Company to the Middlegrounds Development Company, stating that appellants concluded that the financing for the project was in "serious jeopardy." Appellant George S. Wade, Jr., called a meeting of the limited partners in mid-November, excluding any representatives of the developer and from the bank. The purpose of the meeting was to discuss the removal of the developer from the project. Appellants did not file this lawsuit until four years and one month after the mid-November meeting.

Appellant George S. Wade, Jr., admitted on cross-examination that while appellants could tell much of the money from the bank went to a company associated with the developer that had no role in the Middlegrounds project, he could not testify whether or not that company used the money to make payments for costs of the Middlegrounds project.

Based upon the testimony of appellant George S. Wade, Jr., therefore, the following time line of events occurred:

Prior to June 1988    —   Joint venture formed to study idea for luxury condominium development in downtown Toledo, Ohio.

— Marketing studies completed, developer hired and introduced to the bank after partnership formed.

— Bank agrees to loan $7.7 million to developer for acquisition, development, and construction.

— Bank agrees to loan $500,000 to appellants to purchase furniture for five model units and to market the project.

— Bank approves the loan to appellants, but closing of the loan is delayed until appellants receive from the partnership a copy of the letter of intent the bank drafted outlining the terms of the loan to the developer and until the loan to the developer is closed.

June 1988
— Both loans are closed.

— Appellants install a doublewide sales trailer at the construction site, staffed with salespersons and scale models.

September 1988
— Bank officer writes interoffice memo noting no letter of credit or certificate of deposit was posted at the closing of the $7.7 million loan to the developer.

— Appellants have invested $200,000 in the project.

November 1988
— Appellants fire salesman because of slow sales. Remaining salesman had three months of experience.

February 1989
— Appellants have contracts with ten or twelve customers for purchase of condominium units upon completion.

April 1989
— Bank denies request from appellant Wazam for an additional loan. Demands security to be posted for the original $500,000 loan.

— Bank makes statement in Watchlist Status Report that financing should end and liquidation should begin if sales do not materialize in the next six months.

— Bank sends letter to the developer refusing to make any more cash advances on the loan until the developer provides an updated list of costs.

— The Overhead General and Administrative, Project Management and Finance Fee portions of the $7.7 million loan are depleted.

June or July 1989
— Model units open. Bank personnel make site inspections and do not tell appellants of any serious problems with the project.

— On July 5 bank notes expected loss of $2,000,000.

— Appellants continue to invest money in the project, unaware of the developer's funding problems.

— Appellants' remaining salesman quits. Part-time salesman commutes from Florida.

August 1989
— City of Toledo passes an ordinance to provide $1 million to the project.

— Commuting salesman is hired for full-time position.

October 1989
— Appellants learn at a bank meeting that the developer is behind on his loan interest payments and that the budget is insufficient for acquisition and construction of planned yacht club. Loan must be revised.

— Appellants call a meeting of limited partners, excluding the developer and the bank, to discuss firing the developer because the project financing is in "serious jeopardy."

November 1989
— First 57 display units are completed past target date because of unexpected site conditions that caused construction delays.

|  | — | Appellants perceive developer as less interested in the project. |
|  | — | The developer wants to replace the general contractor. |
|  | — | Appellants seek information from the developer about the status of the project financing and gain permission to talk with other parties. |
|  | — | Appellants learn the bank has denied loan draw requests made by the general contractor. |
|  | — | Appellant George S. Wade, Sr., takes accountant to office in Florida to review partnership books. |
|  | — | Appellants learn that developer never posted $1 million in cash called for in the letter of intent for the closing of his $7.7 million loan. |
|  | — | Appellants learn developer has paid himself and his architect partners "exorbitant fees." |
| December 1989 | — | Appellants tell bank loan officer of their findings. |
| Spring 1990 | — | Appellants continue to market the project. |
|  | — | The general contractor leaves the construction site. |
|  | — | Appellants begin meeting with the bank to work out a plan to keep the project going. |
|  | — | The bank rejects proposed plans. |
| March 1990 | — | Workout expert from the bank refuses to deal any longer with appellants. |
| May 1990 | — | Following a foreclosure, the bank appoints a receiver to control the property. |
|  | — | At the time of the failure of the project, appellants have invested $790,356. |

A real estate appraiser who worked for a subsidiary of the holding company that also owned the bank testified at trial. At the bank's request, he did an appraisal of the infrastructure, the general common-area improvements, and of the individual condominium units in order to determine a value per unit in January 1988, before construction began. Once construction started, the bank hired him to do periodic inspections of the construction site to determine how much of the construction was actually completed. He testified that on February 21, 1989, he wrote a letter to the loan officer, stating that he disagreed with the representation made by the developer in a loan draw request about the percentage of work that was completed at the site. In the opinion of the appraiser, less work was completed than the developer had represented to the bank. He later toured the construction site with the loan officer and verbally expressed to the loan officer his opinion that the percentage of construction completed did not match the percentage of the loan that had been released to the developer in response to his loan draw requests. He admitted on cross-examination that his opinion regarding how much construction was completed did not always differ from the estimate stated in the loan request draws presented by the developer to the bank.

A bank consultant also testified as an expert witness. He stated that in his opinion the $7.7 million loan to the developer was not closed in a commercially

reasonable manner. First, there was no infusion of $1 million in cash equity at the time of closing. Second, under the terms of the loan agreement, "it was impossible for the loan to be able to be paid off based upon the terms of the loan closing." He stated that the loan did not extend long enough for the interest to be carried, and that the budget underestimated the costs for project management. He testified that it was his opinion that the loan granted by the bank to the developer and the loan granted by the bank to appellants were interrelated. Therefore, he testified that the bank owed a duty to appellants that included an obligation to tell appellants when the bank began to have misgivings regarding the stability of the loan to the developer.

On cross-examination the banking expert conceded that he knew of no banking rules, laws, or regulations that require banks to make disclosure of facts about one borrower's business to a separate borrower. He admitted that several rules, laws, and regulations exist that require a bank to keep information about customers confidential. Violations of the confidentiality rules can result in liability for the bank and can justify firing the bank employee who disclosed the confidential information. He also testified that he did not believe the bank was required to tell appellants about the change in the rating of the loan to the developer or about the amount of reserve the bank set aside in anticipation of the failure of the loan to the developer. Rather, he maintained that the bank should have told appellants that the bank had concerns about the stability of the loan to the developer.

On redirect examination, the bank expert testified that confidentiality requirements did not apply to prevent the bank from telling appellants about the problems with the developer's loan because appellants were borrowers on the same project. In response to a question from the court, he testified that it would have been commercially reasonable for appellants to go to the bank and ask for information about the status of the loan to the developer, but that appellants may not have known enough information to be aware of the situation and therefore did not ask the bank for information.

The bank called a banking expert to testify in its defense. He opined that the loan to the developer was structured "within reasonable and normal banking practices and procedures." He also testified that the bank followed normal banking practice in regard to the disbursement of funds following draw requests on the loan. The bank sent an independent appraiser to verify the status of the construction and had a title company do an update on the title to the property to ensure that no liens had been filed by unpaid creditors. On cross-examination he admitted that it was unusual for a bank to accept unpaid billing receipts as posted equity for the closing of a loan.

The bank also called as a witness the vice president of the bank's loan administration department. He testified that the bank lost $5.5 million on the loan to the developer. He also testified that in all of his meetings with appellant George S. Wade, Jr., no statements were ever made to him that appellants believed the bank had done something wrong which led to the failure of the project.

In support of their first assignment of error, appellants argue that the bank owed a duty to keep them informed about the final terms of the loan with the developer and about the status of the payments he was making on the loan after it closed because the bank had a fiduciary relationship with appellants. The bank responds that the facts in this case clearly show that no fiduciary relationship existed.

The Supreme Court of Ohio has defined a "fiduciary relationship" as "one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 517, 321 N.E.2d 603, 608. The Supreme Court has considered whether such a relationship exists between a bank and its customers. The court stated in *Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 66, 419 N.E.2d 1094, 1097:

"In *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282 [12 O.O.3d 279, 390 N.E.2d 320], we recognized that, in most instances, the relationship of a creditor to his debtor, governed by the principles of freedom of contract, was not a fiduciary relationship. There, we held that evidence which revealed that the creditor had given advice to the debtor concerning the operation of the debtor's business was insufficient to transform what was otherwise a business relationship into a fiduciary relationship. In so holding, we conclude that, in the matter upon which the advice there was rendered, the parties were operating at arm's length, each seeking to protect his own legitimate business interests." *Id.*

The Supreme Court then distinguished its earlier holding and found that a fiduciary relationship was established when a bank processed a customer's loan and informed the customer about mortgage insurance but did not inform the customer that the customer would have to purchase the insurance himself. *Id.*, 66 Ohio St.2d at 78–79, 20 O.O.3d at 66–67, 419 N.E.2d at 1097–1098. The *Stone v. Davis* court noted that at that stage in the loan process, the parties were no longer dealing at arm's length.

While the particular facts of each case must be evaluated, when the facts are undisputed a court may reach a legal conclusion regarding whether or not a fiduciary relationship exists. See *Indermill v. United Savings* (1982), 5 Ohio

App.3d 243, 244–246, 5 OBR 530, 531–534, 451 N.E.2d 538, 539–542; *Wakeman Oil Co., Inc. v. Citizens Natl. Bank of Norwalk* (Sept. 13, 1996), Huron App. No. H–95–045, unreported, 1996 WL 520060. Applying the precedent from the Supreme Court of Ohio, we conclude that even when all the evidence presented at trial is construed most favorably for appellants, reasonable minds could reach only a conclusion that no fiduciary relationship existed between appellants and the bank in this case.

The record shows the following undisputed facts relevant to the question of whether or not a fiduciary relationship existed between the bank and appellants. Appellants originally got information about the negotiation of loan terms between the bank and the developer by asking the attorney of the developer for information. While the bank was aware that the inquiry had been made by appellants, nothing in the testimony shows that the bank knew or should have known that appellants expected the bank to keep them updated about the terms reached during negotiations between the bank and the developer. Indeed, appellant George S. Wade, Jr., testified that appellants never asked the bank whether any of the initial terms outlined in the copy of the letter of intent they received from the developer's attorney were changed during negotiations between the bank and the developer. While appellants delayed the closing of their loan for marketing until the developer's loan was closed, no testimony was presented by appellants to show that they told the bank one of the reasons for their delay was to ensure that the developer posted $1 million in cash at the time of his closing. Like the parties in *Stone v. Davis*, 66 Ohio St.2d at 74, 20 O.O.3d at 64, 419 N.E.2d at 1095, the parties in this case were bargaining at arm's length regarding the loan for marketing, and were acting to protect their own business interests. If appellants wanted to include as a term for their own loan assurances from the bank that the developer posted $1 million in cash at the closing on his loan, they were free to do so. No fiduciary relationship existed at the time the marketing loan was closed.

Furthermore, no facts were presented to support a ruling that a fiduciary relationship existed between the bank and appellants in regard to the developer's loan after the loans were closed. Appellants never informed the bank that they expected the bank to keep them updated on the status of the developer's repayment of his loan. Appellants were limited partners of the developer and admitted they had access to information from the developer regarding the status of his loan at any time. As appellants' banking expert conceded on cross-examination that no banking rule, regulation, or law exists to support his "opinion," which is actually a legal conclusion, that the bank had a duty to inform appellants of the status of an "interrelated" loan. Appellants were, as the trial judge noted, sophisticated businessmen who had enough information available to them regarding the unexpected problems and costs associated with construction

of the project and the slow sales of units to alert them that problems might be arising with repayment of the developer's loan. Accordingly, nothing existed to alert the bank that appellants were relying upon the bank to keep them apprised of the status of the developer's loan. No facts were presented to show that a fiduciary relationship existed after the loans were closed.

Appellants contend that even if no fiduciary relationship existed, the bank still owed a duty, as outlined in 3 Restatement of the Law 2d, Torts (1977) 119, Section·551, to disclose to appellants that the developer did not post $1 million in cash at the closing of his loan. The provision cited by appellants provides:

"§ 551. Liability for Nondisclosure

"(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

"(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

"(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

"(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

"(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

"(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

Appellants argue that the bank was on notice that they were relying on the term in the letter of intent that the bank sent to Middlegrounds Development Company that required the posting of $1 million in cash equity at the closing of the loan to the developer because (1) the attorney for Middlegrounds Development Company copied the letter to the bank loan officer when he provided it to appellants, and (2) appellants delayed closing their loan for marketing until after the loan to the developer was closed. Appellants contend that the bank owed

them a duty to tell them that negotiations between the bank and the developer occurred after they received a copy of the letter of intent that resulted in a change regarding requirements for equity posted at the time the developer's loan was closed.

We reject the assertion that reasonable minds could conclude that the bank has liability for nondisclosure pursuant to the provisions in 3 Restatement of the Law 2d, Torts (1977) 119, Section 551. The Supreme Court of Ohio applied the provisions of the Restatement section in question when a real estate broker directly made a statement to customers that a house was " 'a good sound house * * * ' " and did not inform the customers later when he learned about a termite infestation. *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 100–101, 12 O.O.3d 108, 110–111, 388 N.E.2d 1367, 1369–1370. However, the facts in this case show that the bank never made any direct representation to appellants that $1 million in cash was required from the developer at the time his loan was closed.

The term to which appellants now point was included in a letter of intent, a document that by its nature is tentative. Appellants learned about the tentative term by asking their general partner for information about the loan to the general partner. Even though the bank had notice that the general partner had shared the information with appellants, nothing in the facts of this case supports a legal conclusion that the bank was under a duty to appellants to disclose that later negotiations with the developer changed the term set forth in the letter of intent. Appellants did not have a fiduciary relationship with the bank or some "other similar relation of trust and confidence," since appellants (1) never informed the bank that they would be depending on the bank, rather than their own general partner to keep them apprised of the final terms of the developer's loan; (2) never asked the bank to provide a final copy of the developer's loan to them for review; and (3) never told the bank that they would only close their own loan if the developer actually posted $1 million in cash at the time his loan was closed. The bank did require the developer to post a form of equity at the time his loan closed, and while the bank did know appellants had been informed of the terms in the letter of intent, the bank did not know and had no reason to know that appellants were relying upon the term in the letter of intent, so the bank was not in a position to know that it was required to inform appellants of the change in the term to avoid a partial or ambiguous statement of the facts.

Appellants cite a second provision from the Second Restatement of Torts to support their assertion that the bank had a duty to inform them of the bank's internal, independent assessment that the developer's loan was in jeopardy after the loans were closed. The second provision cited by appellants is 3 Restatement of the Law 2d, Torts (1977) 119, Section 552. Appellants cite the following portion of the second provision:

"§ 552. Information Negligently Supplied for the Guidance of Others

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

The Supreme Court applied the provisions of the above section to hold an accountant liable to "a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." *Haddon View Invest. Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212, syllabus. The Eleventh District Court of Appeals applied the provisions of the section to hold a bank liable for damages suffered by a bank customer when the customer employed a firm the bank loan officer directed the customer to hire to complete an environmental site assessment and the firm failed to discover extensive ground contamination. *Lippy v. Soc. Natl. Bank* (1995), 100 Ohio App.3d 37, 45–46, 651 N.E.2d 1364, 1368–1370, However, for the following reasons, we find that the provisions of the section in question are not applicable in this case.

First, we note that in this case appellants were not members of a limited class that the bank could reasonably foresee would rely upon it for information about the status of the developer's loan. As we have previously noted, appellants were limited partners with the right to full access to the developer's business records and had already exercised their right to get information from the developer about his loan before either loan was closed. No pattern was established to show that the bank should have foreseen that appellants looked to the bank to keep them apprised of the status of the developer's loan. Second, unlike the situation in *Lippy v. Soc. Natl. Bank,* 100 Ohio App.3d at 45–46, 651 N.E.2d at 1368–1370, the bank in this case never took the step of arranging for appellants to employ a third party to perform a task that the third party was not qualified to perform.

Accordingly, we find no merit in the contention that the bank is liable for a negligent misrepresentation to appellants.

Finally, in support of their first assignment of error, appellants argue that the trial court ruled in error that their "Complaint was barred by the applicable statute of limitations." Our review of the record shows the following statement of the trial judge:

"Now for the purpose of your other argument concerning the statute of limitations, the plaintiff has failed to prove the elements necessary to sustain their case whether or not this was filed within the statute of limitations or not. It doesn't make any difference, so I don't have to say anything about that because it failed utterly in the proof of the loan."

The judge's statement shows that he made no ruling regarding whether or not the applicable statute of limitations barred appellants' claims because he ruled that even if the statute was met, appellants failed to show evidence to support all of the essential elements of their causes of action. Having concluded, like the trial judge, that appellants have not established the elements of a cause of action, this court finds no error in the trial judge's conclusion that the issue of whether the applicable statute of limitations would bar a valid cause of action was moot. Appellants' first assignment of error is not well taken.

In support of their second assignment of error, appellants argue that the trial court erred when it refused to admit some evidence. First, appellants argue that the trial court erred when it excluded from admission at trial a letter the bank loan officer wrote in response to an inquiry from the city of Toledo regarding the status of the developer's loan. We consider this argument because even though the testimony of the bank loan officer is not part of the record, the record does contain a proffer from appellants of the contents of the letter and of the circumstances to the letter being drafted and sent.

The letter was sent by the bank loan officer to the City Manager of Toledo in response to an inquiry regarding the status of the developer's loan. The city of Toledo made the inquiry because city council was preparing to vote on whether or not to approve paying the cost of improvements to the development site, such as break-wall repairs. The letter contained the following statement:

"At present, we are still operating under our loan agreement, and we are advancing funds for development of the site as well as construction of the condo units. There are presently 15 units either completed or under construction, and we have already closed on two of the units. At present, all terms of our loan agreement are being met, and we view the public improvements as an integral part of the overall development of the site."

Appellants argue that the trial court should have admitted the letter into evidence to support their contention that it does not matter that they never asked the bank for information about the developer's loan, because even if they had asked they would not have been told the truth. The bank responds that the trial court correctly excluded the letter from evidence because its proffer for the record showed that appellants were not aware of the contents of the letter and did not in any way rely upon the alleged misstatements in the letter.

The trial court had discretion regarding the admission or exclusion of the evidence at trial. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493–494. Absent an abuse of discretion, this court will not reverse the ruling of the trial court. *Id.* at 163, 17 O.O.3d at 100, 407 N.E.2d at 493–494. As the Supreme Court of Ohio has stated: "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. Our review of the record fails to show that the trial court abused its discretion when it excluded the letter from evidence. Even accepting *arguendo* appellants' contention that the response to the city of Toledo was misleading, we reject as speculative appellants' contention that if they made a similar inquiry they would have received a less than truthful response from the bank. Furthermore, even though appellants now contend in their brief that one of the appellants testified in his deposition that he saw and discussed the letter with his partners before December 1989 and that they relied upon it to reach the conclusion that the developer's loan was progressing as it should, the record shows that appellants did not inform the trial judge about the deposition testimony when the bank proffered that the record showed that appellants did not know about or rely upon the letter. Accordingly, appellants did not preserve for review any error that may have existed. See *State v. White* (1982), 6 Ohio App.3d 1, 6 OBR 23, 451 N.E.2d 533; Evid.R. 103.

Next, appellants contend that the trial court erred when it excluded testimony from appellant George S. Wade, Jr., on redirect that the bank told the state and purchasers of condominium units as well as the city of Toledo that the project financing was stable when it was not. We find that the error, if any, made by the trial court in excluding this evidence was harmless. As we have already discussed, appellants failed to show that they relied upon the bank to keep them apprised about the status of the project financing and failed to show that they had notice of or relied upon any statements made by the bank to third parties regarding the status of the project financing.

Finally, appellants argue that the trial court erred when it did not permit appellant George S. Wade, Jr., to use bank records "to identify funds distributed

by the Bank that were not within MDC's loan budget." The trial court excluded the testimony on the ground that appellant George S. Wade, Jr., is not qualified as a banking expert.

The Supreme Court of Ohio has stated:

"To qualify as an expert, the witness need not be the best witness on the subject. * * * The expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror. * * * A ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion. * * *" (Citations omitted.) *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 107.

We find no abuse of discretion in the trial court's ruling that prevented appellant George S. Wade, Jr., from testifying about alleged wrongful distribution of loan funds. While the record shows that appellant George S. Wade, Jr., did have expertise in drafting a budget for maintaining an existing building, it also shows that his experience with construction loans was limited to construction loans for highways and airports during an internship several years ago while working as an intern for the New Hampshire legislature. The trial court could reasonably conclude that the experience was not recent enough or similar enough to qualify appellant George S. Wade, Jr., as an expert on the construction loan for a residential development construction loan. Appellants' second assignment of error is not well taken.

The bank's cross-assignment of error regarding whether appellants' causes of action are time-barred by a statute of limitations is rendered moot by this court's disposition of the first assignment of error.

The judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the court costs of this appeal.

*Judgment affirmed.*

HANDWORK, SHERCK and EVANS, JJ., concur.

JOHN R. EVANS, J., of the Third Appellate District, sitting by assignment.