704 A.2d 38

UNITED JERSEY BANK AND S.H. MORTGAGE ACQUISITION, L.L.C., PLAINTIFFS–RESPONDENTS, v. KENNETH R. KENSEY AND MICHELLE KENSEY, HUSBAND AND WIFE, DEFENDANTS–APPELLANTS, AND ANNE W. ALSTER, BANK HAPOALIM AND JEFFERSON BANK, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 19, 1997—Decided December 23, 1997.

542

Before Judges BAIME, BROCHIN and BRAITHWAITE.

*Paul Mainardi,* argued the cause for appellants (*Brown & Connery,* attorneys; *Mr. Mainardi* and *Joseph A. Zechman,* on the brief).

*Christine D. Petruzzell,* argued the cause for respondent United Jersey Bank (*Wilentz, Goldman & Spitzer,* attorneys; *Ms. Petruzzell* and *Jonathan P. Falk,* of counsel and on the brief).

*Cory Mitchell Gray,* argued the cause for respondent S.H. Mortgage Acquisition (*Solomon and Weinberg,* attorneys; *Mr. Gray* and *Deborah A. Silodor,* of counsel and on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Plaintiff United Jersey Bank (UJB) and its assignee S.H. Mortgage Acquisition, L.L.C. (S.H.Mortgage) brought this action to foreclose mortgages on three properties owned by defendants Kenneth and Michelle Kensey. The genesis of this litigation was defendants' purchase of several properties from Gerald Katzoff, a bank customer. Katzoff had suffered severe financial losses and was attempting to reduce the substantial debt he owed UJB. Defendants contended that UJB fraudulently induced them to enter into the loan transaction in order to substitute a healthy debtor in the place of the financially ailing Katzoff. The principal question presented below, and now raised here, was whether UJB had a duty to disclose an internal appraisal which indicated that the properties were worth substantially less than the selling price and mortgage amounts, as well as information relating to Katzoff's precarious financial condition. Although defendants were highly experienced commercial real estate investors and were urged by the bank to perform a due diligence investigation of the subject properties because of the conflicting interests of lender and borrower, they engaged in no independent inquiry concerning the value of the properties. The Chancery Division entered summary judgment against defendants striking their defenses and dismissing their counterclaims. Defendants appeal. We affirm.

## I.

Although this appeal is from a summary judgment, the record is voluminous. The material facts are not in dispute. While Kenneth Kensey is a physician, he is also a highly sophisticated businessman. Indeed, shortly before the transaction that is at issue here, Kensey started a company, the Kensey–Nash Corporation, to develop and manufacture medical devices. The company ultimately received the financial backing of Baxter Corporation and Johnson & Johnson, and obtained substantial licensing agreements with Cordis and American Home Products. Kensey initially served as the corporation's chief executive officer in charge of finance, but later became chairman of the board. In 1995, the company completed a major public stock offering. Furthermore, the record indicates Kensey had substantial experience in real estate, investing in residential, commercial, and agricultural properties. Many of these ventures were financed by banks. Kensey also owned a real estate company, several restaurants and a shopping center that he had developed and leased.

In 1992, defendants purchased a summer home in Stone Harbor from Katzoff. A real estate broker, Jack Binder, introduced Kensey to Katzoff. Binder told Kensey that Katzoff was in the process of liquidating his assets and was selling a "mansion," but that the transaction had to be completed "quietly." Binder directed Kensey to UJB for financing, stressing that Katzoff "was in trouble with the bank and that the bank would bend over backwards . . . to help [Katzoff] liquidate the property."

Binder was accurate in his assessment of Katzoff's financial difficulties. Katzoff was a substantial investor in real estate and owned numerous properties, including personal residences, apartment buildings and hotels. Several of these properties were financed by UJB. Katzoff owed UJB substantial amounts. Depending on how the collateral was valued, UJB's security ranged from an excess of $199,568 over Katzoff's net debt to a deficit of $1,350,432. Katzoff owed other banks approximately $6,500,000. Before selling his house to the Kenseys, Katzoff had successfully

extricated himself from over $50,000,000 in contingent liabilities, representing approximately ninety percent of his defaulted loans. Coleman Donaldson, an account officer for UJB, was intent on reducing Katzoff's debt further by encouraging him to liquidate many of his other properties.

UJB was thus willing to finance the entire 1.2 million dollar purchase price of Katzoff's house. On October 1, 1992, defendants executed a note in the amount of $800,000 which was to mature in three years. Defendants had the option to extend the note an additional two years. The note listed as security a mortgage on the Stone Harbor residence, which defendants executed on the same day as the closing. The note was also secured by a second mortgage on another residence owned by defendants. Defendants also gave Katzoff a $400,000 second mortgage on the summer home which was then assigned to UJB.

Katzoff owned other properties in Stone Harbor. These included two commercial properties and two miniature golf courses. The golf courses were situated on the rooftops of two condominium buildings. Resolution Trust Company (RTC) held liens on each of these properties, and at some point threatened to take some unspecified action to recover the underlying debts owed by Katzoff. On December 11, 1992, Donaldson prepared loan offering documents proposing that UJB lend Katzoff $1,200,000 to satisfy Katzoff's debt to RTC. Although unclear from the record, it appears that UJB's objective in financing the loan was to free the properties from any existing liens so that the properties could be sold by Katzoff. The proceeds would then be used to further reduce Katzoff's debt to UJB. The mortgage loan offering documents indicated that the golf courses generated a net income of $147,414 before debt service, and were valued in excess of $1,000,-000.

After this transaction, the bank had the golf courses valued by an independent appraiser pursuant to UJB's internal policy. The appraisal, which is dated July 27, 1993, estimated the aggregate value of the golf courses at $600,000. The income capitalization

approach yielded a value of $634,000, using an 11.3% capitalization rate, while the sales comparison approach yielded a value of $567,400. Donaldson apparently accepted the appraisal, but questioned whether the appraiser was correct in deducting "entrepreneurial profit" from net operating income.

At some point, Kensey was contacted to determine whether he was interested in buying the golf courses. The other two commercial properties had already been purchased by other investors. Donaldson was unable to say who initiated those discussions. Kensey was unsure whether it was Katzoff or Donaldson who first suggested that he purchase the golf courses. In any event, Kensey visited the properties and engaged in discussions with both Katzoff and Donaldson. Kensey testified that he wished "to develop a close relationship with [Donaldson] in order to make other deals." Kensey recounted that he pursued Donaldson and "asked [him] many times for a list of other properties that the bank held...." As phrased by Kensey in his deposition testimony, from the beginning he "tried to develop [a] relationship with the bank to maybe do some deals ... on properties [with which the bank] had trouble...."

Kensey knew that Katzoff's financial condition was deteriorating. He was aware of the fact that Katzoff had defaulted on his loans and that UJB had "take[n] back" several of his properties. Moreover, Kensey distrusted Katzoff because Katzoff had misrepresented the condition of the Stone Harbor residence and had taken various fixtures prior to the sale.

In his negotiations concerning the golf courses, Kensey never asked for any documents. He nevertheless received from Katzoff or Katzoff's employees the income and expense figures which listed $40,653 in expenses and net income of $107,014. Based upon information he had received from an appraiser with whom he was acquainted, Kensey believed that a "rough" estimate of a commercial property's value could be derived from multiplying the property's net income by ten. Kensey engaged in several discussions with Donaldson relating to the net income figure that had

been given to him by Katzoff. Donaldson indicated his belief that the properties were "undermanaged" and perhaps could "do much better." However, Kensey testified that Donaldson was "very noncommittal," emphasizing that the golf courses were "cash businesses" and the income figures could not be "substantiat[ed]." Kensey also discussed the project with a "financial banker" he knew who questioned whether the golf courses could generate the income that had been represented by Katzoff. We digress to note, however, that the independent appraiser retained by UJB had apparently used the same income figures as those conveyed to Kensey by Katzoff in arriving at his estimate of the value of the properties. Moreover, no evidence was presented indicating that the income figures were inflated.

Kensey never hired an appraiser. Although Kensey knew that UJB had an appraisal of the properties, he never requested it or engaged in any discussion pertaining to the subject. According to Kensey, he assumed that banking laws made it illegal for a lending institution to lend more than one hundred percent of the value of the property financed.

The transaction contained two main components. Kensey was to purchase both golf courses for a purchase price of $1,430,000, and he was not to infuse "any cash . . . into the deal." It is clear that Donaldson was a major participant in the negotiations between Katzoff and Kensey respecting the sale of the golf courses. It is not at all clear, however, who made the final determination as to the purchase price, or whether Donaldson could veto Katzoff's acceptance of any proffered offer. On December 6, 1993, UJB gave defendants a commitment letter for the $1,430,000 golf course loan. The loan was to be made on a full recourse basis, would mature on October 1, 1998, and would accrue interest according to a base rate that varied periodically by formula. The Kenseys were to agree to "cross-collateralize" and "cross-default" the notes and mortgages for the new $1,430,000 golf course loan and the $800,000 Stone Harbor residence loan.

The commitment letter recited Kensey's representation that he "conducted [his] own thorough 'due diligence' ... investigation" of the properties. The letter advised Kensey to obtain separate counsel. In bold-face type, the letter warned that "THE INTERESTS OF BORROWER AND LENDER ARE OR MAY BE DIFFERENT AND MAY CONFLICT." Kensey signed the commitment letter on the day of the closing, December 29, 1993. On that day, defendants, who were represented by counsel, executed a $1,430,000 golf course purchase money mortgage, and an agreement modifying the $800,000 mortgage on the Stone Harbor residence to include cross-collateral and cross-default provisions.

Defendants received the loan proceeds the next day. Of the $1,430,000 advanced, defendants used $280,000 to satisfy the discounted amount of the second mortgage on the Stone Harbor mansion that had been assigned to UJB. The remaining $1,150,000 was used by defendants to purchase the golf courses.

Following the transaction, UJB retained a different appraiser who estimated the value of the summer house at $1,270,000. Another appraiser gave an estimated value of $350,000 for the golf courses. A sales comparison approach indicated a value of $400,-000 while an income approach indicated a value of $320,000 using a 15% capitalization rate. The appraisal noted that the golf courses were assessed for property tax purposes at $559,700, and that their "pro rata share of the greater condominium land assessments" was $779,200, for a total of $1,338,900.

In December 1994, Kensey stopped making payments on the Stone Harbor home loan. Several months later, UJB sought a rent receiver for the golf courses based upon defendants' default on both loans. S.H. Mortgage subsequently purchased both notes and mortgages.

The Chancery Division granted plaintiffs' motion for summary judgment, concluding that UJB owed no duty to disclose information indicating that the golf course properties were worth less than the selling price and the mortgage amount. In reaching this conclusion, the court emphasized that there was no fiduciary

relationship between the parties and thus no duty on the part of the bank to volunteer information that was readily accessible to Kensey, a sophisticated businessman with broad experience in the field of real estate investment.

## II.

Defendants' claim of fraud rests upon several interrelated strands. They argue UJB was bound to inform them that Donaldson was assisting Katzoff in "working out" his debt at the time they were negotiating financing for the purchase of the golf course properties. They further assert that UJB was obliged to disclose the appraisal which indicated that the properties were worth significantly less than the purchase price and the mortgage amount. Defendants argue that they were fraudulently induced to enter the transaction by reason of UJB's failure to disclose this information. These contentions raise novel and far-reaching issues concerning a bank's relationship with its customers.

Every fraud in its most fundamental conception consists of "the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Center of Sussex County v. Whale*, 86 *N.J.* 619, 624, 432 *A.*2d 521 (1981) (citing 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* 421 (5th ed.1941)). Legal fraud consists of "a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely [on the misstatement], resulting in reliance by that party to his detriment." *Ibid.* (citing *Foont–Freedenfeld Corp. v. Electro–Protective Corp.*, 126 *N.J.Super.* 254, 257, 314 *A.*2d 69 (App.Div.1973), *aff'd*, 64 *N.J.* 197, 314 *A.*2d 68 (1974)). The elements of scienter, *i.e.*, knowledge of the falsity and an intention to obtain an advantage by deceit, "are not essential if [the] plaintiff seeks to prove that a misrepresentation constituted only equitable fraud." *Id.* at 625, 432 *A.*2d 521 (citing *Equitable Life Assurance Soc'y of the United States v. New Horizons, Inc.*, 28 *N.J.* 307, 314, 146 *A.*2d 466 (1958) ("Scienter is not an essential

element of equitable fraud.")); 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* at 486–88.

■ Silence in the face of a duty to disclose may constitute a fraudulent concealment. *See Strawn v. Canuso*, 140 *N.J.* 43, 56, 657 *A.*2d 420 (1995) (quoting *Weintraub v. Krobatsch*, 64 *N.J.* 445, 449, 317 *A.*2d 68 (1974)). The question of whether a duty exists is a matter of law. *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.*, 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994) (quoting *Wang v. Allstate Ins. Co.*, 125 *N.J.* 2, 15, 592 *A.*2d 527 (1991)). The question is one of fairness and policy that "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citing *Goldberg v. Housing Auth.*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)).

■ There are three general classes of transactions in which a duty to disclose arises. *Berman v. Gurwicz*, 189 *N.J.Super.* 89, 93, 458 *A.*2d 1311 (Ch.Div.1981), *aff'd*, 189 *N.J.Super.* 49, 458 *A.*2d 1289 (App.Div.), *certif. denied*, 94 *N.J.* 549, 468 *A.*2d 197 (1983). The first involves fiduciary relationships such as principal and agent or attorney and client. *Ibid.* The second embraces situations in which " 'either one or each of the parties, in entering . . . [the] transaction, expressly reposes . . . a trust and confidence in the other . . . or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence . . . is necessarily implied.' " *Id.* at 93–94, 458 *A.*2d 1311 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* at 552–54). The third includes contracts or transactions which in their essential nature, are "intrinsically fiduciary," and "necessarily call[ ] for perfect good faith and full disclosure, without regard to any particular intention of the parties." *Id.* at 94, 458 *A.*2d 1311 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* at 552–54).

■ Within this analytical framework, we have said that there is no presumed fiduciary relationship between a bank and its customer. *Globe Motor Car Co. v. First Fidelity Bank, N.A.*, 273 *N.J.Super.* 388, 393, 641 *A.*2d 1136 (Law Div.1993), *aff'd*, 291 *N.J.Super.* 428, 677 *A.*2d 794 (App.Div.), *certif. denied*, 147 *N.J.* 263, 686 *A.*2d 764 (1996). *See also Klemm v. Labor Co–op. Nat. Bank of Paterson*, 117 *N.J.L.* 284, 287, 187 *A.* 640 (E. & A.1936). The virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty. *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 *F.*2d 47, 53 (3d Cir.1988); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 *F.*2d 112, 122 (2d Cir.1984); *Weinberger v. Kendrick*, 698 *F.*2d 61, 78–79 (2d Cir.1982), *cert. denied*, 464 *U.S.* 818, 104 *S.Ct.* 77, 78 *L.Ed.*2d 89 (1983); *Barnett Bank of West Florida v. Hooper*, 498 *So.*2d 923, 925 (Fla.1986); *see also Peterson v. Idaho First Nat'l Bank*, 83 *Idaho* 578, 367 *P.*2d 284 (1961); *Richfield Bank & Trust Co. v. Sjogren*, 309 *Minn.* 362, 244 *N.W.*2d 648 (1976); *Klein v. First Edina Nat'l Bank*, 293 *Minn.* 418, 196 *N.W.*2d 619 (1972); *Frame v. Boatmen's Bank of Concord Village*, 824 *S.W.*2d 491 (Mo.Ct. App.1992); *Pigg v. Robertson*, 549 *S.W.*2d 597 (Mo.Ct.App.1977); *Solicitor for the Affairs of His Majesty's Treasury v. Bankers Trust Co.*, 304 *N.Y.* 282, 107 *N.E.*2d 448 (1952); *Thigpen v. Locke*, 363 *S.W.*2d 247 (Tex.1962); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 *Wash.App.* 456, 656 *P.*2d 1089 (Wash.Ct.App.1982); Cecil J. Hunt, II, *The Price of Trust: An Examination of Fiduciary Duty and the Lender–Borrower Relationship*, 29 *Wake Forest L.Rev.* 719 (1994); Edward L. Raymond, Annotation, *Bank's Liability Under State Law for Disclosing Financial Information Concerning Depositor or Customer*, 81 *A.L.R.4th* 377 (1990); Annotation, *Existence of Fiduciary Relationship Between Bank and Depositor or Customer So As To Impose Special Duty of Disclosure Upon Bank*, 70 *A.L.R.*3d 1344 (1976 & Supp.1996); *cf. National Westminster Bank of N.J. v. Lomker*, 277 *N.J.Super.* 491, 495–96, 649 *A.*2d 1328 (App.Div.1994), *certif. denied*, 142 *N.J.* 454, 663 *A.*2d 1361 (1995); *Roth v. First Nat'l State Bank of N.J.*, 169 *N.J.Super.* 280, 284–85, 404 *A.*2d 1182 (App.Div.), *certif.*

*denied,* 81 *N.J.* 338, 407 *A.*2d 1212 (1979). "Fiduciary relation-ships implied in law are premised upon the specific factual situa-tion surrounding the transaction and the relationship of the par-ties." *Capital Bank v. MVB, Inc.,* 644 *So.*2d 515, 518 (Fla.Dist.Ct. App.1994) (citing *Denison State Bank v. Madeira,* 230 *Kan.* 684, 640 *P.*2d 1235 (1982)), *review denied,* 659 *So.*2d 1086 (Fla.1995).

As aptly noted by the Court of Appeals for the Third Circuit, it " 'would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table,' " because their respective positions are essentially adver-sarial. *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 *F.*2d at 53 (quoting *Weinberger v. Kendrick,* 698 *F.*2d at 79). *Cf. Gross v. Grimaldi,* 64 *N.J.Super.* 457, 462, 166 *A.*2d 592 (App.Div.1960), *certif. denied,* 34 *N.J.* 469, 169 *A.*2d 744 (1961). There is, there-fore, a general presumption that the "relationship between lenders and borrowers is conducted at arms-length, and the parties are each acting in their own interest." *Temp–Way Corp. v. Continen-tal Bank,* 139 *B.R.* 299, 318 (E.D.Pa.) (citing *Frowen v. Blank,* 493 *Pa.* 137, 143–45, 425 *A.*2d 412, 416 (1981)), *aff'd,* 981 *F.*2d 1248 (3d Cir.1992). We see no sound basis to depart from these principles here. Succinctly stated, this case involves neither a "fiduciary relation[ship]" nor a transaction that is "intrinsically fiduciary." *Berman v. Gurwicz,* 189 *N.J.Super.* at 94, 458 *A.*2d 1311 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* at 552–54).

We thus focus upon the second category of cases to which we referred previously—those situations in which one of the parties "expressly reposes a trust or confidence in the other" or because of the circumstances, "such a trust or confidence is . . . necessarily implied." *Id.* at 93–94, 458 *A.*2d 1311 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* at 552–54). *See, e.g., Dale v. Jennings,* 90 *Fla.* 234, 244, 107 *So.* 175, 179 (1925); *Capital Bank v. MVB, Inc.,* 644 *So.*2d at 518. We recognize the growing trend to impose a duty to disclose in many circumstances in which silence historically sufficed. *See Chiarella v. United States,* 445 *U.S.* 222, 248, 100 *S.Ct.* 1108, 1124, 63 *L.Ed.*2d 348, 369 (1980)

(Blackmun, J., dissenting); *Capital Bank v. MVB, Inc.*, 644 *So.*2d 515; *First Nat'l Bank in Lenox v. Brown*, 181 *N.W.*2d 178 (Iowa 1970); *Trans–Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish*, 583 *So.*2d 443 (La.1991); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 *Wash.App.* 456, 656 *P.*2d 1089 (1982). This trend is reflected in the *Restatement (Second) of Torts* § 551 (1977 & Supp.1997). Subsection (1) sets out the traditional rule requiring disclosure of a fact which the individual knows may justifiably induce another to act, or refrain from acting, in a business transaction only if the individual is under a duty to disclose the matter. Subsection (2) sets out the conditions under which an individual has a duty to disclose certain information. Subsection 2(e) imposes a duty upon a party to disclose to another "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Comment "1" to § 551, subsection (2), recognizes the difficulty in determining or identifying the factors that would give rise to an expectation of disclosure. The comment observes that the situation envisioned is one in which the advantage taken of the plaintiff's ignorance is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling...." Our Supreme Court has adopted that interpretation of the *Restatement. Strawn v. Canuso*, 140 *N.J.* at 60–61, 657 *A.*2d 420.

The position adopted in the *Restatement* is reflected in a lengthening line of decisions holding banks and other lending institutions liable to their customers for gross acts of misconduct and deceit, or, where "special circumstances 'may' exist where 'the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank [so] to counsel and inform him.' " *Parker v. Columbia Bank*, 91 *Md.App.* 346, 369, 604 *A.*2d 521, 532–33 (Md.Ct.App.) (quoting *Klein v. First Edina Nat'l Bank*, 293 *Minn.* 418, 422, 196 *N.W.*2d 619, 623 (1972)). Although these decisions are difficult to categorize, the

common thread running through them is that the lender encouraged the borrower to repose special trust or confidence in its advice, thereby inducing the borrower's reliance. *See* Cecil J. Hunt, II, *The Price of Trust: An Examination of Fiduciary Duty and the Lender–Borrower Relationship,* 29 *Wake Forest L.Rev.* at 739–78. Three examples suffice.

In *Barnett Bank of West Florida v. Hooper,* 498 *So.*2d 923 (Fla.1986), the plaintiff, a customer of the bank, was told by the bank's loan officer, that Hosner Investments, another of the bank's customers, was financially sound and had passed Internal Revenue Service scrutiny. *Id.* at 924. The loan officer encouraged the plaintiff to borrow $90,000 from the bank and place it with Hosner as a tax shelter investment. At the time of the negotiations, the bank knew that Hosner was involved in a "check kiting" scheme and that its checking account was substantially overdrawn. When Hosner deposited the plaintiff's check representing the loan proceeds, the bank applied the amount to "zero out the Hosner account." *Ibid.* While "reluctant to formulate a rule of disclosure ... at tension with the general [principle of confidentiality]," the Supreme Court of Florida found the existence of "special circumstances" that required the bank to apprise the plaintiff of Hosner's perfidious scheme. *Id.* at 925. The Court reasoned that "where a bank having actual knowledge of fraud being perpetrated upon a customer, enters into a transaction with that customer in furtherance of the fraud," it could be held liable for the resulting loss. *Ibid.*

In another Florida case, *Capital Bank v. MVB, Inc.,* 644 *So.*2d 515, Capital Bank, through its loan officer, engineered MVB's purchase of manufacturing equipment from Tellason Products, Inc., one of the bank's customers on the verge of bankruptcy. The bank loaned MVB the amount necessary to make the purchase. *Id.* at 519. The manufacturing equipment purchased by MVB turned out to be defective, ultimately causing substantial losses to MVB. *Id.* at 518. Thereafter, MVB sued the bank, alleging fraud and breach of fiduciary duty. The court found that

Capital Bank owed a fiduciary duty to MVB. It based its holding on the fact that the bank continuously promised and pressured MVB to enter into transactions with Tellason. *Ibid.* At one point, a bank loan officer coaxed MVB to "[d]o it for us.... [Y]ou are part of [the] Capital Bank family. You help the bank, we are going to help you." *Id.* at 519. To convince MVB to continue to purchase Tellason's equipment, the loan officer showed MVB a "ballpark" appraisal, an appraisal that was factually inaccurate and completely inflated Tellason's net worth. *Ibid.* In finding that a fiduciary relationship existed, the court stated that "special circumstances transformed this lender/borrower relationship into a fiduciary one." *Id.* at 520 (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 *P.*2d at 1089). It found that the loan officer's actions advising, reassuring and urging MVB to purchase Tellason's assets expressly invited MVB's reliance on the bank as its "financial advisor." *Ibid.*

In *Central States Stamping Co. v. Terminal Equipment Co., Inc.*, 727 *F.*2d 1405 (6th Cir.1984), the plaintiff was engaged in negotiations to purchase machinery from a customer of the bank. Upon inquiry, the bank assured the plaintiff that, although the customer was somewhat undercapitalized, it had "maintain[ed]" its financial commitments. *Id.* at 1407. In fact, the customer was heavily indebted to the bank, which had assumed a supervisory role over its day-to-day management. Immediately after the plaintiff made a substantial payment to the customer, the equipment company went out of business. The payment was used by the bank to reduce the defunct customer's debt. *Ibid.* Citing the *Restatement*, the Court of Appeals for the Sixth Circuit held that the bank was guilty of fraudulent concealment. *Id.* at 1408. The court reasoned that once the bank undertook to advise the plaintiff with respect to the bank customer's financial condition it "had a duty to disclose information in [its] possession which would reasonably be considered material to the decision [it] knew [the plaintiff] was in the process of making." *Id.* at 1409.

These cases all involved egregious breaches of the lender's duty of good faith and fair dealing. In each of these cases, the bank actively encouraged the plaintiff to rely upon its advice and concealed its self-interest in promoting the transaction involved. In blunt terms, the banks acted no better than common swindlers. In less egregious circumstances, however, the courts have found no duty on the part of lenders to disclose information they may have concerning the financial viability of the transactions the borrowers were about to enter. *See, e.g., Chrysler Credit Corp. v. First Nat'l Bank & Trust Co. of Washington*, 746 *F.*2d 200, 207 (3d Cir.1984); *Cogan v. Triad Am. Energy*, 944 *F.Supp.* 1325, 1329-30 (S.D.Tex.1996); *Folsom v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 633 *F.Supp.* 178, 186 (N.D.Ill.1986) (citing *Restatement (Second) of Torts*, § 551); *Kesselman v. National Bank of Arizona*, 188 *Ariz.* 419, 423, 937 *P.*2d 341, 345 (Ariz.Ct. App.1996); *Frazier v. Southwest Sav. & Loan Ass'n*, 134 *Ariz.* 12, 18, 653 *P.*2d 362, 368 (Ariz.Ct.App.1982); *Moore v. Bank of Fitzgerald*, 225 *Ga.App.* 122, 125-26, 483 *S.E.*2d 135, 139 (Ga.Ct. App.1997); *Northern Trust Co. v. VIII South Mich. Assocs.*, 276 *Ill.App.*3d 355, 363-64, 212 *Ill.Dec.* 750, 757, 657 *N.E.*2d 1095, 1102 (Ill.App.Ct.1995); *Commercial Nat'l Bank in Shreveport v. Audubon Meadow Partnership*, 566 *So.*2d 1136, 1139 (La.Ct.App.1990); *First NH Banks Granite State v. Scarborough*, 615 *A.*2d 248 (Me.1992); *Boubelik v. Liberty State Bank*, 553 *N.W.*2d 393, 397-98 (Minn.1996); *Klein v. First Edina Nat'l Bank*, 293 *Minn.* 418, 421, 196 *N.W.*2d 619, 622 (1972); *Blon v. Bank One, Akron*, 35 *Ohio St.*3d 98, 101-02, 519 *N.E.*2d 363, 367-68 (1988); *Zammit v. Society Nat'l Bank*, 115 *Ohio App.*3d 543, 555-57, 685 *N.E.*2d 850, 858-60 (Ohio Ct.App.1996) (citing *Restatement (Second) of Torts*, § 551); *United States Nat'l Bank of Oregon v. Fought*, 291 *Or.* 201, 219-21, 630 *P.*2d 337, 348-49 (1981); *Burwell v. South Carolina Nat'l Bank*, 288 *S.C.* 34, 41, 340 *S.E.*2d 786, 790 (1986); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 *Wash.App.* 456, 459-60, 656 *P.*2d 1089, 1092-93 (1982).

We find no special circumstances in this case that required the bank to disclose: (1) Donaldson was assisting Katzoff

in "working out" his substantial debt, or (2) the bank had an appraisal indicating that the golf course properties were worth less than the purchase price and the mortgage amount. The fact that Donaldson was attempting to reduce Katzoff's debt was obvious and well known to Kensey. Kensey had been told by Binder that Katzoff had significant financial problems and was attempting to reduce his debt by liquidating his assets. Binder steered Kensey to UJB, accurately predicting that the bank would be strongly inclined to provide financing for the purchase of Katzoff's house and other assets. UJB's interest in accomplishing that goal was apparent on its face. The bank owed no duty to disclose Katzoff's precarious financial condition. To the contrary, our decisions and those of other jurisdictions recognize that a bank owes an obligation of confidentiality in respect of the financial integrity of a depositor or customer. See *National Westminster Bank of N.J. v. Lomker*, 277 *N.J.Super.* 491, 495–96, 649 *A.*2d 1328 (App.Div.1994), *certif. denied*, 142 *N.J.* 454, 663 *A.*2d 1361 (1995); *Roth v. First Nat'l State Bank of N.J.*, 169 *N.J.Super.* 280, 284, 404 *A.*2d 1182 (App.Div.), *certif. denied*, 81 *N.J.* 338, 407 *A.*2d 1212 (1979); *see also Milohnich v. First Nat'l Bank of Miami Springs*, 224 *So.*2d 759 (Fla.Dist.Ct.App.1969); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 *Wash.App.* at 459, 656 *P.*2d at 1092; *State v. McCray*, 15 *Wash.App.* 810, 551 *P.*2d 1376 (1976); Annotation, *Bank's Duty to Customer or Depositor Not to Disclose Information As to His Financial Condition*, 92 *A.L.R.*2d 900 (1963).

We also conclude that UJB owed no duty to supply Kensey with its internal appraisal of the golf properties. The law "imposes no duty on banks to disclose to the borrower the manner in which the lender internally analyzes and underwrites a loan." *Northern Trust Co. v. VIII South Mich. Assocs.*, 276 *Ill.App.*3d 355, 364, 212 *Ill.Dec.* 750, 657 *N.E.*2d 1095, 1102 (Ill.App.Ct.1995). It has been said, albeit in a related context, that a financial institution, acting within its conventional role as a lender of money, owes no duty of care to the borrower when preparing an appraisal of the borrower's collateral. *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231

*Cal.App.*3d 1089, 1096–97, 283 *Cal.Rptr.* 53, 56–57 (Cal.Ct.App. 1991).

While we have found no reported New Jersey opinion dealing with the precise issue presented, the Texas Court of Appeals recently sustained a summary judgment on facts similar to those presented here. In *Berry v. First National Bank of Olney,* 894 *S.W.*2d 558 (Tex.App.1995), the Berrys contacted the bank seeking a loan for the purchase of motel property. The bank had a mortgage on the property and desired that it be sold to a financially healthy party. In response to the Berrys' inquiries, the bank's loan officer told them that the purchase price was "a good deal." *Id.* at 560. At the time this statement was made, the bank had in its file an appraisal indicating that the property was worth substantially less than the purchase price. *Ibid.* Following the sale of the property, the Berrys brought suit to rescind the mortgage, claiming that the bank had a duty to disclose the appraisal. The lower court granted summary judgment, and the Court of Appeals affirmed. In its decision, the court found no special relationship between the Berrys and the bank that would require disclosure of the internal appraisal. *Id.* at 560.

We, of course, recognize that *Berry,* although factually similar, is not directly on point. However, the essential principle we derive from that decision is that a bank generally owes no duty to disclose an internal appraisal to a prospective borrower. Here, for example, the appraisal was done for UJB's benefit, not for the benefit of the borrower. It is axiomatic that estimating the value of commercial property is a difficult task, a task which is dependent upon numerous factors. Where, as here, the underlying information is readily accessible to the borrower, we perceive no sound basis to impose on the bank the duty to investigate the value of the property and supply that information to the borrower. Viewing the facts in a light most favorable to defendants, we cannot fairly say that UJB "[knew] or ha[d] reason to know that [Kensey was] placing his trust and confidence in [UJB] to counsel

and inform." *Parker v. Columbia Bank*, 91 *Md.App.* at 369, 604 A.2d at 532–33.

Defendants contend that UJB violated its internal policy on setting loan to value ratios, as well as federal supervisory regulations on the subject. They assert that UJB owed the duty to apprise them of this violation. Our examination of the bank's loan policy manual does not support defendants' claim.[1] The manual states that the ratio of loan value to market value for commercial mortgages "should be" eighty percent, which was lower than the eighty-five percent supervisory limit imposed by federal regulations. However, the manual states that the ratio is "necessarily a guideline and [is] flexible." The federal guidelines are also not written in stone. The guidelines specifically state that "provision should be made for the consideration of loan requests from creditworthy borrowers whose credit needs do not fit within the institution's general lending policy." 12 *C.F.R.* Pt. 365, App. A (1997). The guidelines note that "[a]n institution may provide for prudently underwritten exceptions to its lending policies, including loan to value limits." *Ibid.* We add that both UJB's internal lending policy and the federal guidelines provide for the aggregation of cross-collateralized property. Because the mortgages cover both the Stone Harbor residence and the golf courses, it is at least arguable that there was no deviation from UJB's policy and the guidelines.[2] This is so because the value of the Stone Harbor residence, according to a later appraisal, far exceeded the $800,000 mortgage that was initially placed on the property. We need not

---

[1] Although not cited by the parties, we note for the sake of completeness that New Jersey has adopted substantially similar guidelines respecting loan to market value ratios. *See N.J.S.A.* 17:9A–65D; *N.J.A.C.* 3:10–1.1 to –4.1. We are satisfied that UJB's policy manual fully complies with the regulations.

[2] New Jersey guidelines also allow banks to exceed the eighty-percent limit through cross-collateralization. The regulations provide that banks are "authorized to make mortgage loans in excess of the [80%] ratio between appraised value and amount of a loan ... provided that the amount of such excess is secured by other collateral having a value ... at least equal to the amount of the excess." *N.J.A.C.* 3:10–3.1.

dwell on this point. As we noted earlier, UJB was under no duty to disclose the manner in which it internally analyzed and underwrote the loan. *Northern Trust Co. v. VIII South Mich. Assocs.*, 276 *Ill.App.*3d at 364, 212 *Ill.Dec.* at 757, 657 *N.E.*2d at 1102.

We discern no basis to impose liability on UJB. To be sure, banks are not popular institutions. Only bankers and bank robbers love banks. But, we perceive no sound reason to impose upon a bank the responsibility to supply a potential borrower with its estimate of the value of the subject property, at least where, as here, the borrower has the ability to make that determination. The principal factors shaping the duty to disclose "have been the difference in bargaining power" between the parties "and the difference in access to information." *Strawn v. Canuso*, 140 *N.J.* at 59, 657 *A.*2d 420. Neither factor is present in this case. Defendants were not neophytes to real estate transactions. They saw advantage and profit in Katzoff's failing financial condition. The Kenseys gambled and lost. The loss should remain where lack of success in the marketplace has put it.

## III.

We briefly address defendants' remaining claims. They assert that UJB should be equitably estopped from pursuing foreclosure because the bank was guilty of "unclean hands." Defendants also contend that the mortgages should not be enforced because there was a failure of consideration, and because the underlying transaction was unconscionable and violated public policy. These arguments do not require extended discussion. *R.* 2:11–3(e)(1)(E). However defendants' claims are phrased, they all rest upon the underlying thesis that UJB violated its duty of disclosure. We find no breach of that duty, and thus the result is the same regardless of how defendants' arguments are couched.

Defendants contend that the Law Division erred in denying their motion to amend the complaint to include a claim under the Consumer Fraud Act. We find no abuse of discretion. Of course, we recognize that motions for leave to amend should be

liberally granted. *G & W, Inc. v. East Rutherford Bor.*, 280 *N.J.Super.* 507, 516–17, 656 *A.*2d 11 (App.Div.1995); *City Check Cashing, Inc. v. National State Bank,* 244 *N.J.Super.* 304, 308, 582 *A.*2d 809 (App.Div.), *certif. denied,* 122 *N.J.* 389, 585 *A.*2d 391 (1990); *Brower v. Gonnella,* 222 *N.J.Super.* 75, 80–81, 535 *A.*2d 1006 (App.Div.1987). Leave to amend should be freely given even if the ultimate merits of the amendment are uncertain. *G & W, Inc. v. East Rutherford Bor.,* 280 *N.J.Super.* at 516, 656 *A.*2d 11; Pressler, *Current N.J. Court Rules,* comment on *R.* 4:9–1 (1997). Here, however, defendants' motion was untimely, and the proffered claim under the Consumer Fraud Act was wholly dependent upon whether UJB violated a duty of disclosure. *See Strawn v. Canuso,* 140 *N.J.* at 61, 657 *A.*2d 420. Although "an omission of a material fact that violates a specific regulation promulgated under the Act can be sufficiently deceptive to invoke the Act's sanctions without proof of intent," *Chattin v. Cape May Greene, Inc.,* 124 *N.J.* 520, 525, 591 *A.*2d 943 (1991) (Stein, J., concurring), the record is barren of any evidence supporting such a claim. We thus sustain the Law Division's denial of defendants' motion.

Defendants' final argument is that the Law Division erred by denying their motion for further discovery from S.H. Mortgage. The discovery requested, however, had no bearing on the central issue presented, *i.e.,* whether UJB breached a duty of disclosure.

Accordingly, the summary judgment is affirmed. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995).