**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2342
_____

ROBERT KENNY,
                              Appellant

v.

SUSAN M. DENBO;
RIDER UNIVERSITY;
THE RIDER UNIVERSITY CHAPTER OF THE
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-16-cv-08578)
District Judge: Honorable Anne E. Thompson
_____

Argued March 23, 2018

Before: HARDIMAN, BIBAS, and ROTH, *Circuit Judges*

(Filed: May 3, 2018)
_____

Robert Kenny, Esq. [ARGUED]
145 Shrewsbury Court
Pennington, NJ 08534
        *Pro Se Appellant*

Steven Gerber, Esq. [ARGUED]
Mary P. Gallagher, Esq.
Schoeman Updike Kaufman & Gerber
155 Willowbrook Boulevard
Suite 300
Wayne, NJ 07470
        *Counsel for Appellees Rider University and Susan Denbo*

Matthew D. Areman, Esq.
Markowitz & Richman
123 South Broad Street
Suite 2020
Philadelphia, PA 19109
        *Counsel for Appellee The Rider University Chapter of the American Association of University Professors*

_____

OPINION[*]
_____

BIBAS, *Circuit Judge*.

Adjunct Professor Robert Kenny substituted for Professor Susan Denbo while she was on sabbatical. After an arbitration, he was suspended for borrowing her syllabus. Kenny's borrowing resulted from an excusable misunderstanding. Only later did evidence come out that Denbo had passed along that syllabus specifically for the adjunct to use. But the unavailability of certain evidence at the arbitration does not justify rescinding his settlement.[†]

## I.

**A. Requesting and Receiving a Syllabus.** For sixteen years, Kenny taught accounting and business law as an adjunct professor at Rider University in New Jersey. Denbo taught

---

[*] This disposition is not an opinion of the full court and, under I.O.P. 5.7, does not constitute binding precedent.

[†] Kenny appeared pro se and argued his case before us. His argument was reasoned and helpful to the Court.

Legal and Ethical Aspects of Management. In the fall of 2011, Rider hired Kenny to teach that course the next spring, when Denbo was to go on sabbatical. In preparation for her sabbatical, Denbo gave her syllabus to department chair Ira Sprotzer to share with the adjunct who would fill in for her.

At Kenny's request, Sprotzer gave Kenny a hard copy of the syllabus. Kenny thought that Sprotzer had pulled the copy from his files. He did not know, and learned only in discovery in this lawsuit, that Denbo had given that syllabus to Sprotzer to share.

Kenny also visited Rider's Blackboard website, where faculty post course materials, and downloaded a copy of the syllabus from Denbo's web page. Denbo's Blackboard settings, which were not the default, let guests access her other course materials as well, including student resources and assignments. But Kenny did not download or share them. He tweaked the syllabus's grading scale, but otherwise kept the readings, sequence, and assignments verbatim. Then he uploaded the syllabus to the spring 2012 course module.

The week before classes started, Kenny called Denbo to ask permission to use some of the student resources listed in the syllabus and available on her Blackboard site. Responding by email, she complained that it was "[u]nbelievable!!!!!" that his syllabus was all but identical to hers. DA 86. She also asked how he had accessed her materials and which materials students might have seen.

Kenny explained that he could access the materials through Blackboard and that, if she wished, he would "change everything including the homeworks." DA 82. She wished, so he reworked the syllabus, did not post any of her student resources, and did not use her

3

assignments. In an effort to appease her, Kenny also apologized and assured her it would never happen again.

Nonetheless, Denbo was "outraged!!!!!" by all this. DA 86. In a series of emails to Rider administrators, she accused Kenny of "EXTREME unethical behavior," fuming that he had accessed "MY ENTIRE BLACKBOARD!!!" using the guest access permitted by her Blackboard privacy settings. DA 99. Denbo also fulminated that Kenny's syllabus "is IDENTICAL to my syllabus and references all of my Blackboard materials." *Id.* In follow-up emails, she continued her tirade, deploying such punctuation-peppered interjections as "UGH!!!!" and "REALLY?????????" DA 102, 105. Even though she conceded that "he assured me that he had not posted anything yet," she suggested that Kenny never teach at Rider again. DA 99-100.

**B. Unprecedented Discipline for Borrowing a Provided Syllabus.** Rider acceded to Denbo's request. For the first time at Rider (as far as we know), an adjunct professor was disciplined for using a syllabus given to him by his department chair for a course that he was hired to substitute teach. As the Union grievance officer testified, in his thirty-eight years at Rider, he had never seen syllabi posted with attribution. And Sprotzer conceded that he had never heard of any university where adjuncts were given syllabi but needed to seek further permission to use them. App. 315-16. He also admitted that Rider developed its unwritten policy against such borrowing only *after* Kenny's arbitration. App. 298-99, 315.

4

Rider's Dean sent Kenny a letter charging him with "serious unprofessional conduct" and suspending him for the summer and fall of 2012. DA 55. Under the Collective Bargaining Agreement, the Union appealed that discipline to the Provost on Kenny's behalf. As the Union's letter explained, Kenny had "reasonabl[y] but inaccurate[ly] assum[ed]" that, because Denbo made her course materials available to guests on Blackboard, she had given implied permission to use them. DA 61. The Provost rejected these arguments and sustained the discipline.

**C. Nondisclosure in Arbitration.** Kenny's discipline went to arbitration. The Union was not allowed to depose witnesses, but it asked for all materials collected during the Provost's investigation, including correspondence, emails, and Blackboard records.

The arbitration itself was never completed. The arbitrator took no evidence or testimony. After Rider's opening statement, and ten minutes into the Union's opening, the arbitrator cut off the Union's lawyer and held a sidebar conference. When the Union's lawyer returned from that conference, he relayed to Kenny and to the Rider faculty's Union representative that the arbitrator "wanted to see a settlement," and "gave a broad outline" of the sort of agreement the arbitrator had in mind. DA 277. According to the Union's lawyer, the arbitrator felt that any settlement "needed to include [Kenny's] suspension." *Id.*

The Union's lawyer came back to Kenny with a proposed settlement and presented it as a fait accompli. Kenny signed it. As part of the settlement, he apologized in writing to Denbo and accepted a suspension for the fall of 2012. Neither side admitted wrongdoing. Since then, Rider has not offered Kenny any teaching assignments. When Kenny applied

5

for unemployment compensation, Rider told the state authorities that Kenny had been suspended for misconduct. So his application was denied.

**D. Discovery Surfaced During This Suit.** Kenny filed this suit in New Jersey state court. He alleged that Denbo had libeled him by claiming that he had used her syllabus without permission and that Rider had breached the settlement agreement by reporting his suspension to the state. In discovery, three previously undisclosed emails came out. And in depositions, both Denbo and Sprotzer admitted that Denbo had given Sprotzer the hard copy of the syllabus so that Sprotzer could give it to Kenny. But neither Sprotzer nor Denbo testified that Kenny was authorized to copy or to teach directly from Denbo's syllabus. Kenny then added a fraud count, seeking to rescind the arbitration settlement. And after Kenny discovered emails in which Denbo questioned why the Union was defending Kenny, he added a claim against the Union for breaching its duty of fair representation.

The Union removed this case to federal court, and all defendants moved for summary judgment. The District Court granted summary judgment to the defendants on all counts. We review the grant of summary judgment de novo. *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 75 (3d Cir. 2018).

## II.

Although Rider's and Denbo's behavior was perhaps overheated and uncalled for in light of the actual conduct at issue, no reasonable juror could find that it crossed the line into legal wrongs.

**A. Fraud.** Though Rider did not produce three emails before arbitration, that fact cannot support either Kenny's legal or equitable fraud claim. Both torts require a material

6

misrepresentation. *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005); *Liebling v. Garden State Indem.*, 767 A.2d 515, 518 (N.J. Super. Ct. App. Div. 2001). But Kenny has produced no evidence that could justify a jury in finding a misrepresentation here. Not turning over the three emails in question could amount to one only if Rider had an obligation to do so. And while New Jersey does recognize that "[s]ilence in the face of a duty to disclose may constitute a fraudulent concealment," it imposes such a duty only in limited circumstances. *See United Jersey Bank v. Kensey*, 704 A.2d 38, 43 (N.J. Super. Ct. App. Div. 1997). This is not a case involving—at least as between Kenny and his employer—"fiduciary relationships such as principal and agent." *Id.* at 44.

Nor are settlement negotiations the kind of "transactions which in their essential nature, are intrinsically fiduciary, and necessarily call for perfect good faith and full disclosure." *Id.* (internal quotation marks and alteration omitted). In other circumstances, the New Jersey courts have declined to find a quasi-fiduciary relationship when the parties act "at arms-length, … in their own interest," and stand in "essentially adversarial" positions. *Id.* at 44-45 (discussing lender-borrower negotiations). All of these qualities are present in a labor arbitration conducted, like this one, between sophisticated parties represented by counsel.

New Jersey also recognizes, however, that in some circumstances "the nature of [the parties'] dealings, or their position towards each other," "necessarily implie[s]" a level of "trust and confidence" that creates a duty to disclose. *Id.* at 44 (internal quotation marks omitted). And perhaps, as Kenny argues, the informal discovery that the parties engaged in leading up to the arbitration was such a situation. *See* Kenny Br. 26 ("[A]fter agreeing to discovery it was incumbent upon the University to proceed honestly and in good faith.").

7

Even if New Jersey law would imply such a duty here, it could hardly extend any further than obligating Rider to respond in good faith to the discovery requests that the Union *actually made*. If Rider's duty to disclose arose from the Union's request for documents, then that duty could have extended only as far as disclosing all the documents that were actually responsive, namely those that the Provost collected in deciding to uphold Kenny's discipline. As Rider and Denbo point out, the Union's grievance officer testified under oath that he was unaware of any responsive documents that the Provost held back. Given the limited scope of the Union's request, Kenny must present evidence from which a jury could conclude that the Provost collected those three emails during the disciplinary process. Because Kenny has marshalled no such evidence, he cannot prove a misrepresentation and his fraud claims cannot survive.

**B. Libel.** Kenny's libel claim likewise fails. The District Court arguably erred in finding that Denbo's statements were mere opinion rather than factual. But "[w]e can affirm the District Court's grant of summary judgment on any basis supported by the record." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 753 (3d Cir. 2017).

Denbo's complaints to administrators fall within a qualified privilege for reporting employees' conduct to their supervisors. *Feggans v. Billington*, 677 A.2d 771, 775-77 (N.J. Super. Ct. App. Div. 1996). Denbo sincerely believed that Kenny's conduct amounted to plagiarism, so her statement was not knowingly false. And her mistake about Kenny's permission does not amount to reckless disregard of the truth. *See id.* at 777. She did not give the syllabus directly to him and was not completely unreasonable in believing that passing it along to Sprotzer did not authorize verbatim copying. That is particularly true because

8

the Collective Bargaining Agreement recognized syllabi as intellectual property. No reasonable juror could find otherwise. So the statements are privileged, not libelous.

**C. Breach of Contract.** Kenny claims that Rider breached its settlement contract by telling a partial truth. Rider told the unemployment-compensation authorities that it had suspended Kenny for misconduct at work. He asserts that Rider should also have explained that he had not admitted guilt. But nothing in the settlement agreement required Rider to say anything more.

**D. Duty of Fair Representation.** Finally, Kenny claims that the Union breached its duty of fair representation. That claim is time-barred. Under 29 U.S.C. § 160(b), such claims must be brought within six months of the breach. Here, Kenny added Count Four more than four years after the arbitration. Nor does equitable tolling apply. The Union did not actively conceal Denbo's email, and its reply evinces its commitment to represent him vigorously.

\* \* \* \* \*

As the District Court suggested, Kenny had to endure not only the "outrage[ ]!!!!!" of tenured Professor Denbo, but also a "University [that] overreacted … in order to placate [that] overwrought tenured professor." App. 33; DA 86. Regardless of how one judges the propriety of their behavior, they did not violate the law. So we must affirm the judgment of the District Court.

9