JOURNAL ENTRY and OPINION
Plaintiff-appellant herein, Kenneth F. Seminatore, appeals from the entry of a directed verdict at trial on all counts in favor of each of the appellees.[1]
The trial court entered a directed verdict on behalf of several individual defendants at the close of the plaintiff's case. Subsequently, at the close of the defendants' case, but prior to closing argument, the trial court entered a directed verdict in favor of the remaining individual defendants, as well as the legal professional association (L.P.A.) defendant. For the reasons adduced below, we affirm in part and reverse and remand in part the decision of the trial court.
Appellant is a lawyer in the greater Cleveland area who previously practiced law at a law firm known as Climaco, Climaco, Seminatore, Lefkowitz and Garofoli (n.k.a Climaco, Climaco, Lefkowitz and Garofoli) (hereinafter "CCLG"). During the course of the appellant's tenure at the Climaco firm, circa 1982, the law firm chose to change its legal status from a general partnership to an L.P.A pursuant to R.C. 1785. The L.P.A. was composed of a number of shareholders who each owned one share of the corporation.[2] At all times relevant, the appellant was both a shareholder of the L.P.A. and a party to the general partnership agreement.
CCLG became a fairly prominent law firm during the course of the appellant's tenure. The firm eventually opened offices in Columbus and Washington. The appellant himself served both as a Cleveland city councilman and as member of the Cleveland School Board. Other members of the firm also served on the Cleveland City Council and the school board and held other public offices during different periods. At one time during the 1990's, the firm counted a former United States congressman as a "contract partner" (as opposed to shareholder).
In addition to other high profile clients, the firm at one time or another represented the national Teamsters union during the Jackie Presser era (as well as many other local and regional unions) and the Gateway Development Corporation which was responsible for the development and construction of Jacobs Field, the Gund Arena and other support projects in what is now known as the Gateway neighborhood of downtown Cleveland. All of the principals of the firm who testified at trial stated that the firm enjoyed a diverse clientele base and was uncommonly skilled at providing expert legal representation in numerous different practice areas.
In December of 1983, the appellant was invited to a Christmas party hosted by Gerald Austin, a political operative who was closely connected to then governor, Richard Celeste. As the party was to be held in Columbus, Austin suggested that the appellant ride down to the cocktail party with another acquaintance of his, John "Jack" Burry, who was a corporate officer of Medical Mutual Insurance Company.[3] About halfway to Columbus Burry retained the appellant to provide legal representation on behalf of Medical Mutual — Blue Cross/Blue Shield of Ohio ("BC/BS").
It would be an understatement to suggest that BC/BS proved to be a very lucrative client for CCLG. During the course of the firm's representation of BC/BS from sometime in 1984 through early 1997, CCLG grossed approximately $80,000,000 in revenue from BC/BS. In order to accommodate the extensive requirements involved in representing BC/BS on such a large scale, the CCLG firm developed a dedicated legal unit whose express purpose was to service the needs of its star client and, also, leased additional office space in downtown Cleveland away from its headquarters in the Halle Building. The appellant testified at trial that during the majority of the time that BC/BS was a client of CCLG he devoted one hundred percent of his time to working on BC/BS files and to generally attending to the legal needs of BC/BS.[4]
On September 13, 1988, the appellant, in his individual capacity, entered into an agreement with BC/BS whereby he would be paid a minimum of $75,000 per month for a period of twelve months, plus ordinary and necessary expenses at such time that either he or BC/BS "deem[ed] the attorney-client relationship terminated as to new or future matters."[5]
The "contract" in question was in letter form and was addressed to the appellant at his home address. The agreement expressly permitted the appellant to direct payment to "your current firm, or otherwise, as you see fit." The agreement was signed by John Burry, Jr. in his capacity as "President and Chief Executive Officer" of BC/BS. The appellant signed an acknowledgment of receipt of the agreement and acceptance of the terms thereof on November 8, 1988.
At trial it was established that the appellant concealed the existence of this agreement from the rest of the CCLG firm for a considerable period of time. The earliest that the existence of this agreement was revealed was sometime during 1994 in response to an FBI subpoena in connection with an investigation of the firm.
Sometime in early 1996 a merger/acquisition between BC/BS and Columbia Health Care Systems ("Columbia") was proposed. Columbia was only one of a string of several suitors which had expressed an interest in acquiring BC/BS. As part of the transaction, the corporate officers and members of the board of trustees were to receive very large bonuses, most totaling in the millions of dollars. One of these bonuses was to be paid to the appellant, in his personal capacity, in the form of a non-compete agreement. The total sum that was called to be paid to the appellant was $3,500,000. At trial the appellant testified that the non-compete agreement in no way related to any legal services and would not have been binding on any other members of the firm. Rather, the appellant stated, the monies to be paid were in consideration for his agreement to forego using his formidable marketing skills to compete for clients against the new entity that would have been established if the merger had been approved.
Given the exorbitant amount in bonuses called for by the proposed deal, as well as concerns raised about the effect of such a merger on local hospitals and health care providers, various newspapers and citizens groups began to publicly criticize the merger and to point out the conflict of interest inherent in the large bonuses being paid out to the corporate officers, as well as to the board members responsible for approving the transaction. The appellant responded to criticism of the Columbia deal by threatening to institute civil and/or criminal legal proceedings against several of the offending parties.
The proposed joint venture between BC/BS and Columbia was subject to the approval of the Ohio Department of Insurance ("ODI"). Shortly after the joint venture was proposed, the ODI began its investigation into the merger. As part of the investigation, the ODI needed to examine the bonuses being paid out to BC/BS officials, including the $3,500,000 to be paid to the appellant and the $900,000 severance agreement between BC/BS and appellant.
In addition to the investigation being conducted by the ODI, the Ohio Attorney General's Office became involved in the proceedings when it filed a lawsuit in Cuyahoga County seeking to impose a constructive trust on the assets of BC/BS for the benefit of the citizens of the state. The attorney general's complaint reasoned that BC/BS had received a large tax benefit throughout its history due to its "non-profit" status and, therefore, could not simply sell itself off to a private, for-profit suitor without accounting for increased revenues directly attributable to its special tax status. Additionally, several class action suits were filed throughout the state on behalf of BC/BC policyholders seeking to block the transaction.
During the latter part of 1996 and early 1997 it became increasingly clear that due to the numerous questions that had been raised concerning the propriety of the transaction, it would not receive the necessary approval from the ODI. The negative publicity that was generated in turn led to some internal turbulence at BC/BS. As a result of this internal fighting at BC/BS, Burry was eventually terminated from his position as CEO after having himself attempted to fire several members of management. Once Burry was ousted from his position at the helm of BC/BS in March of 1997, it became a foregone conclusion that CCLG's, and particularly the appellant's, days representing BC/BS were numbered. Seeing that the CCLG was losing its largest client under extremely adverse and unusual circumstances, the paramount concern of the firm became collection of the outstanding bills for legal work that had already been completed on behalf of BC/BS. There was testimony at trial that the CCLG's total bill to BC/BS for legal work performed during the month of February 1997 alone was approximately $1,750,000.[6]
On March 18, 1997, there was an agreement reached which settled the attorney general's lawsuit and resolved the situation involving Burry and the more junior members of BC/BS's management. At this point, the proposal for a joint venture with Columbia had become a dead issue. The March 18, 1997 agreement permitted Burry to retire from BC/BS and established Kent Clapp, who was not an ally of the appellant's, as the new president and chief operating officer of BC/BS. The agreement, to which the appellant was not a party in any way, contained the following provision that is relevant to the instant lawsuit:
 4. Immediately upon execution of this agreement, Kenneth F. Seminatore shall no longer represent or be associated with BCBSMO and shall not be permitted on the premises of BCBSMO's place(s) of business. Additionally, immediately upon execution of this agreement the Climaco, Climaco, Seminatore, Lefkowitz Garofoli law firm (Climaco), the Ohio Department of Insurance and BCBSMO shall begin the review, evaluation and analysis of all pending litigation matters involving BCBSMO for which the Climaco law firm has been retained. * * * Contemporaneously upon the execution of this agreement, the Climaco law firm shall be instructed by Mr. Clapp and Mr. Burry to immediately return to BCBSMO or its designated agent all legal documents, correspondence and records germane to BCBSMO and the law firm's representation thereof * * *. John Burry and Kent Clapp shall transmit separate instructions to Mr. Seminatore and the Climaco law firm confirming the matters set forth in this paragraph. (Emphasis added.)
The facts surrounding the events subsequent to the ouster of Burry, CCLG and the appellant from BC/BS are the subject of considerable dispute. What is not disputed is that the appellant did not appear at the CCLG offices for an extended period of time after being terminated by BC/BS.[7] The appellant was asked at trial whether he remembered going on a vacation with his family to Florida during this period. The appellant responded, "[n]o, I have no specific recollections on that." The appellant also testified that he had no memory of having a meeting with the members of the BC/BS dedicated service unit during this time frame, although he admitted that he had been told by several members of the unit that such a meeting did take place.
What is known is that several members of the CCLG firm other than the appellant met with new counsel for BC/BS. The meeting took place with David Young of the law firm Squire, Sanders and Dempsey on March 24, 1997 to discuss the transition period in which CCLG would provide assistance to new BC/BS legal counsel in getting up-to-date on all pending legal matters and to see that all files pertaining to BC/BS were transferred to new counsel. By all accounts of the attendees at the meeting, it went as smoothly as could be expected. Young assured the CCLG representatives that they would be compensated for all legal fees incurred during this transition period, yet stated that he was not in a position to guarantee payment of fees already incurred.
On or about March 21, 1997, CCLG had started the process of laying off nearly half of the lawyers employed by the firm and numerous support personnel in anticipation of the loss of revenue that would be the inevitable result of losing BC/BS as a client.
On March 27, 1997, appellant caused a hand written letter to be delivered "via messenger"[8] to the Office of the General Counsel of BC/BS demanding payment under the terms of his 1988 "severance agreement" with BC/BS. This letter reads in its entirety as follows:
 Enclosed is a copy of (sic) self-explanatory 1988 Agreement, whose (sic) provisions are now triggered. This constitutes notice ". . . deeming said termination to have occurred."
 As the March, 1997 payment is due, payable to me at the address set forth in the Agreement by March 31, 1977 (sic), please remit same via messenger.
On March 28, 1997, Young called attorney John Climaco and advised him of the contents of the appellant's letter demanding payment under the 1988 agreement. At the time that he received this call, Climaco was traveling from Cleveland to Columbus, along with other members of the firm, to meet with the Superintendent of Insurance. Climaco claimed at trial that he was so shocked to learn that the appellant sent the March 27, 1997 demand letter that he nearly drove off the road. In response to learning of appellant's demand for payment, John Climaco issued a letter of his own to Kent Clapp expressing his dismay that appellant had attempted to demand payment under the 1988 agreement and stating further that:
 This letter will formally notify you, on behalf of our firm, to disregard any written or oral communication sent to you from Mr. Seminatore. Mr. Seminatore is not authorized to speak or act on behalf of our firm.
This letter, dated March 28, 1997, was purportedly dictated by John Climaco while still en route to Columbus after getting off the phone with Young.
Also, on March 28, 1997, CCLG sent a letter to appellant which reads as follows:
 Certain unauthorized actions and statements by you during the past several weeks compels (sic) the firm to insist that you no longer make any statements or take any action on behalf of the firm or that may be adverse to the interest of the firm.
 Effectively immediately, you are to take a leave of absence from the firm until we can meet to discuss the firm's future. In addition, in the best interest of the firm and with the consent of the principals below, the firm is changing its name to Climaco, Climaco, Lefkowitz and Garofoli Co., L.P.A.
 Please deliver the GUDPAC checking accounts to Donna Cydzik for safekeeping.
The above letter was signed by ten principals of the firm.[9]
The appellant's termination from the firm was thereafter made official on April 7, 1997.
Another incident that the appellees claim played some role in the termination of the appellant occurred in February 1997 when the law firm and the appellant each entered a plea of no contest in the Franklin County Court of Common Pleas to two misdemeanor counts of failing to file accurate updated registration statements in violation of R.C.101.71(C).[10]
Pursuant to an agreement of all members of the firm, the appellant was to limit his remarks after the plea hearing to a prepared statement that had been approved by a committee set up within the firm and was to avoid any additional inflammatory comments. A number of the principals at the firm apparently became upset when the appellant deviated from the prepared remarks and made an additional comment to the media, in both his oral statement and a written release, something to the effect of "in the arena, sometimes even the winning gladiator gets cut." At the plea, the appellant also remarked that he would prefer to pay a fine rather than to perform community service because the fine would be tax deductible. Several members of the firm testified that they believed that the appellant's remarks were intemperate and motivated more out of the appellant's own hubris than any desire to vindicate the firm.
In his own testimony at trial, the appellant stated that his remarks were in keeping with CCLG's aggressive, confrontational approach and were similar in style and substance to public comments made in the past by other members of the firm during high profile litigation.
The appellant filed the within action seeking damages arising out of his termination against CCLG as well as against a number of the shareholders of the legal professional association in their individual capacity on October 22, 1997. The individual shareholders named as defendants in the suit were John Climaco, Michael Climaco, Paul Lefkowitz, Dennis Wilcox, John Peca and Anthony Garafoli. The lawsuit was initially filed in Franklin County, but was transferred to Cuyahoga County on March 16, 1998 after a finding by the Franklin County trial court that venue was not appropriate in that county.
Trial commenced in the within action on June 1, 1999. At the time of the trial, the three remaining counts against the appellees were for breach of contract, breach of fiduciary duty and promissory estoppel. At the close of the plaintiff's case, the trial court entered a directed verdict in favor of individual defendants Lefkowitz, Wilcox and Peca on all counts. At the same time the trial court also entered a directed verdict in favor of all defendants on the promissory estoppel and breach of fiduciary duty claims. Thus, at this point in the trial the only remaining claim was the breach of contract claim (which the trial court referred to as a claim for "unlawful discharge") as it applied to the CCLG law firm and individual defendants John Climaco, Michael Climaco and Anthony Garafoli.
At the close of the appellees' case at trial, and immediately before final arguments were scheduled to commence, appellees' attorney renewed his motion for a directed verdict on the remaining counts against the remaining defendants. The trial court then proceeded to "dismiss" all remaining counts against the remaining defendants. In support of its ruling the trial court made the following findings:
 The court makes the following finding. It is undisputed at this time that a valid oral contract has not been proven. The elements are the same as a written contract. There must be an offer, consideration and acceptance. Plaintiff has failed to establish such an agreement as a matter of law.
 It is clear that Mr. Seminatore has engaged in the practice of law outside the scope of professional responsibility. In fact, your statements as they apply to the proceedings in the Columbus court specificating (sic) the statements about a gladiator being cut and a fine which were tax deductible, this court finds outrageous.
 Therefore, it finds as a matter of law that your termination was not wrongful termination. Any law firm would be in violation themselves if they allowed or by there (sic) inaction encouraged these actions or statements that you have portrayed. In fact, there are no allegations that your termination was based on race, age, color, religion or political affiliation or any other factors which the law would consider as being wrongful grounds for termination.
 Mr. Seminatore's conduct was so outrageous that the Climaco law firm had a right to separate themselves from him. Therefore, the defendants will be dismissed as a matter of law.
The appellant timely filed a notice of appeal from the rulings of the trial court and assigns a total of eight assignments of error for this court's review.[11] The first assignment of error states:
 I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN EXCLUDING THE TESTIMONY OF DOUGLAS A. ANDREWS.
Douglas Andrews was a principal in the CCLG law firm during the relevant time period in which the events took place that led to appellant's termination. Prior to Andrews' testimony, the appellees made a motion in limine to preclude any testimony of Andrews that occurred after the effective date of appellant's termination from the firm on the theory that nothing which occurred at the firm after the departure of the appellant could possibly have any relevance to the appellant's claims. The appellees also sought to exclude any mention of a settlement agreement that had been reached between Andrews and the law firm pursuant to a lawsuit filed by Andrews after he was also terminated from the firm shortly after the appellant was let go.
The parties argued the appellees' motion in limine on the record for an extensive period of time. At least at one juncture it appeared as if the parties had reached a mutually acceptable stipulation as to the acceptable parameters of Andrews' testimony.
Yet, the trial court in its ruling on the motion not only prohibited Andrews from testifying as to the limited subject areas sought to be prohibited by the appellees, but it went much further and prohibited Andrews from providing any testimony whatsoever on the grounds that anything he might testify to outside of the scope of the testimony sought to be limited by the motion in limine would not be relevant. The trial court made the following findings in support of its ruling:
 The court has had an opportunity to listen to all of the arguments with reference to Mr. Andrews and his testimony and the court renders the following opinion; this court agrees with Mr. Satullo, Mr. Andrews should be precluded from testifying in any respect in this case.
 I have reviewed the substance of his affidavit that was submitted in conjunction with the summary judgment proceedings in this case. It is the opinion of this court that if Mr. Andrews were permitted to testify, his testimony would transcend far beyond the testimony permitted a fact witness into the realm of opinion testimony.
 Most notably, opinion testimony as to the truth or veracity of parties to this lawsuit. The situation is complicated further by the fact that counsel for defendants will not have an opportunity to fairly and adequately cross-examine Mr. Andrews relative to his bias and/or prejudice without retrying Mr. Andrews' own wrongful termination case, without opening the doors to the facts and circumstances surrounding Mr. Andrews' termination.
 This court has thoroughly read the confidentiality agreement that Mr. Andrews entered into with the Climaco firm at the time his case was resolved in another courtroom. This agreement is clear and unambiguous in that it prohibits Mr. Andrews from testifying here regarding the facts of his termination.
* * *
 This court's function is to provide a fair trial to all parties involved in this case. It will not permit a three-ring circus to be conducted in the courtroom which, if allowed to take place, would further distort and confuse the already complex issue that the jury has been called upon to decide.
 As an aside, this court also notes that Mr. Andrews was not a shareholder of the Climaco firm at the time many of the agreements that are directly at issue in this case were formed.
Appellant's attorney made a proffer at trial of the proposed testimony of Andrews which this court has reviewed.
Exclusion of witnesses is ordinarily a decision within the sound discretion of the trial court. State v. Smith (1990), 49 Ohio St.3d 137,142, 551 N.E.2d 190. An abuse of discretion is more than an error of law and judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
In the instant case, this court is compelled to conclude that the trial court committed prejudicial error in excluding any and all testimony that would have been offered by Andrews. Andrews was a partner in the firm during the period leading up to the appellant's termination. Andrews, according to the proffer, would have testified that he had been employed at CCLG since 1985, that he was made an equity partner in July of 1994 and, that at the time of the trial, he was a practicing attorney in the Cleveland area. He would have also testified as to what he was told by John and Michael Climaco concerning the method of compensation of different levels of partners, the structure of the legal professional association and the alleged method by which a departing shareholder could redeem his interest in the corporation. Andrews would have also testified that he was told by Michael Climaco that no partner had ever been fired and that a partner could not be terminated for any reason short of losing his law license. Additionally, Andrews worked closely with the appellant on the BC/BS litigation which eventually led to the appellant's termination and could have testified as specifics of the attorney general's lawsuit on whether the non-compete payment was merely a "bargaining chip," which the appellant never expected to realize, and the details of the manner by which the appellant demanded payment under his 1988 severance agreement. Andrews would have also testified that he was told by John Climaco that there was an unwritten agreement regarding the formula for the purchase of an equity partner's "sweat equity" when he would leave the firm. Andrews' testimony would have also touched on the relationship between the appellant and John Climaco and how it deteriorated during the pendency of the proposed Columbia transaction. Finally, Andrews could have testified that, although he was a partner at CCLG at the time of the appellant's firing, he was never consulted or asked his opinion on the matter prior to the March 28, 1997 letter being sent to the appellant, he never attended any meetings where the topic was discussed and he was never told the reasons behind the firm's decision to sever its relationship with the appellant.
The trial court's finding that by permitting Andrews' testimony, the court would have been turning the trial into something akin to a "three-ring" circus is simply not supported by the record. The court's ruling went far beyond even that which was requested by the appellees. All of the proffered testimony outlined above was highly relevant to the ultimate issue(s) to be decided by the finder of fact and, therefore, should not have been excluded.
Evid.R. 401 defines relevant evidence as follows:
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.
Evid.R. 402 provides that evidence which is relevant under Evid.R. 401 is generally admissible:
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.
Evid.R. 403(A) provides that relevant evidence is nonetheless not admissible where its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.
In the instant case, the appellant's attorney agreed to limit his direct examination of Andrews to issues other than the circumstances surrounding Andrews' own departure from CCLG and his subsequent lawsuit against the firm and settlement.[12] The appellees' assertion that no testimony that might have been provided by Andrews in relation to happenings at the firm after the date of appellant's termination could possibly be relevant is plainly illogical. Clearly, there could have been incidents that transpired or admissions that were made by the actors involved in the events that led to this lawsuit during the period between April 7, 1997, when the appellant was officially terminated, and May 31, 1997, when Andrews was terminated, which would have some bearing on some or all of the appellant's claims and would thus constitute relevant evidence. The trial court's decision to pre-emptively prohibit any testimony whatsoever from a shareholder/attorney at CCLG who had been in the firm's employ for a period of twelve years was an abuse of discretion. This assignment of error is sustained.
The appellant's second assignment of error states:
 II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN EXCLUDING THE TESTIMONY OF MR. SEMINATORE'S DAMAGES EXPERT.
Evid.R. 702 provides that a witness may testify as an expert if each of the following three criteria apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons.
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony; and
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the results of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
* * *
 (3) The particular procedure, test or experiment was conducted in a way that will yield an accurate result.
Thus, pursuant to this rule, a witness may testify as an expert if the following three conditions are met: (1) he or she is qualified as an expert by virtue of specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (2) the testimony relates to matters beyond the knowledge or experience of lay persons or dispels a common misconception among lay persons; and (3) the testimony is based upon reliable scientific, technical, or other specialized information. Nichols v. Hanzel (1996), 110 Ohio App.3d 591,597, 674 N.E.2d 1237, 1240-1241.
Evid.R. 703 provides that opinion testimony by an expert must be based on facts or data "perceived by him or admitted into evidence at the hearing." Russell v. Corbin (Dec. 9, 1999), Cuyahoga App. Nos. 74939, 75236, unreported.
The appellant's proposed expert on damages in the case sub judice was Alan Duvall. At the time of the trial Mr. Duvall was an attorney licensed to practice in Ohio[13], a certified public accountant, a certified valuation analyst, and a certified fraud analyst. Additionally, Duvall was the chairman of the Dayton Bar Association Business and Finance Committee. During the voir dire conducted to determine whether Duvall qualified as an expert under Evid.R. 702, Duval indicated that he was a frequent lecturer at legal seminars on a variety of topics, including projecting income in divorce cases for purposes of pension matters. Duval also stated that he had testified in the past in similar cases involving separation of attorneys from law firms in other Ohio courts, although never in Cuyahoga County.
The appellees' principal objection to Duvall's testimony was that his projections as to future income were invalid because he did not take into consideration the fact that the firm's revenue had dropped significantly since the loss of BC/BS as a client. Duvall used the appellant's tax returns between the years 1992-1996 to reach an average annual salary for the appellant of $955,000. Duvall then projected this annual salary over a period of fifteen years (based on the assumption that the appellant would continue working until the age of 65) and reduced it to present value to reach a total lost wage figure of $8,395,100. The appellees claimed that this figure was inaccurate because not even John Climaco, who everybody agreed made the most of anyone in the firm, made $955,000 during the years 1997 and 1998. Thus, the appellees argued, and the trial court agreed, Duvall's testimony was not based on reliable scientific, technical or other specialized information, and should be excluded.
The appellees also objected to Duvall's estimates of appellant's earning as a solo practitioner because Duvall failed to account for the fact that appellant practiced in downtown Cleveland, rather than in the suburbs, and that he was a white male who, according to a survey conducted by the Ohio State Bar Association which Duvall cited in his report, have higher average salaries than other sole practitioners.
The trier of fact determines what weight should be given to expert testimony. See State v. Thomas (1982), 70 Ohio St.2d 79, 80. Any weakness in the factual underpinnings of expert testimony goes to the weight and or credibility of the testimony, rather than its admissibility. E.g.,Johnson v. Knipp (1973), 36 Ohio App.2d 218, 220, 304 N.E.2d 914:
 The absence of certain facts or the failure of proof of others, goes to the weight and credibility of the testimony, and not to its admissibility. The burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination * * *.
In Pacific Great Lakes Corp. v. Bessemer Lake Erie R.R. (1998),130 Ohio App.3d 477, 501-502, 720 N.E.2d 551, this court recently reviewed the threshold determination that a trial court must make in ruling on the admissibility of expert testimony under Evid.R. 702:
 To qualify as an expert, the witness need not be the best witness on the subject. Alexander v. Mt. Carmel Med. Ctr. (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566. The expert must demonstrate some knowledge of the particular subject superior to that possessed by an ordinary juror. State Auto Mut. Ins. Co. v. Chrysler Corp. (1973), 36 Ohio St.2d 151, 160, 65 O.O.2d 374, 379, 304 N.E.2d 891, 897. A ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion. Alexander, supra, 56 Ohio St.2d at 157, 10 O.O.3d at 333, 383 N.E.2d at 565. citing, Scott v. Yates (1994), 71 Ohio St.3d 219, 220-221, 643 N.E.2d 105, 106-107.
To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable.Nakoff v. Fairview Gen. Hosp., 75 Ohio St.3d at 256, 662 N.E.2d at 3-4;Colboch v. Uniroyal Tire Co., Inc. (1996), 108 Ohio App.3d 448, 461,670 N.E.2d 1366, 1374-1375.
"Where essential facts are for whatever reason omitted by the questioner from the hypothetical question, the opposing party certainly has the right, on cross-examination, to re-ask the question in which such additional evidentiary facts as it desires may be incorporated, and to obtain the opinion of the expert witness on the basis of the revised question." Price v. Daugherty (1982), 5 Ohio App.3d 157, 159,450 N.E.2d 296.
In the instant case, the appellant's expert clearly possessed "knowledge of the particular subject superior to that possessed by an ordinary juror." Appellees' counsel was free at trial to attempt to discredit appellant's expert during cross-examination by pointing out perceived inconsistencies in the data relied upon by the expert in reaching his conclusion. The decreased revenue in the wake of the BC/BS termination was an "additional evidentiary fact" which appellees' counsel could have used to attempt to elicit a revised opinion on the appellant's lost earnings from Duvall.
The mere fact that the various shareholders at CCLG saw a decrease in their incomes during the years 1997 and 1998 in relation to the five preceding years in no way invalidates the projected earnings figures reached by Duvall. Every attorney presently or formerly associated with CCLG who testified at trial stated that the firm had a diverse clientele list and excelled in numerous different practice areas. The reality that the firm saw a substantial decrease in their total revenue for the years 1997 and 1998 is not necessarily indicative that the firm revenues would remain depressed for the next thirteen years. These were all questions properly explored during cross-examination.
Additionally, the fact that CCLG laid off nearly half of the attorneys it employed in the wake of the BC/BS termination and took many other steps to reduce overhead makes it more likely, rather than less likely, that the firm will again reach the total income levels it enjoyed during the "heyday" of its representation of BC/BS from 1992-1996.
The trial court seemed to place considerable emphasis on the fact that Duvall had never testified as an expert in Cuyahoga County before. Given that Duvall's practice was based in the Dayton area, as was the law practice of appellant's attorney, and that the case was pending in Franklin County for approximately five months before being transferred to Cuyahoga County, this fact is not of substantial significance to this court.
Thus, we conclude that because Duvall was well qualified to offer expert testimony on the issue of the appellant's future damages, the trial court abused its discretion in excluding the testimony of appellant's expert on this issue. This assignment of error is sustained.
The appellant's third and sixth assignment of error, having a common basis in law and fact, will be addressed concurrently in this decision. The appellant's third and sixth assignments of error state:
 III. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DIRECTING A VERDICT ON MR. SEMINATORE'S CLAIM OF BREACH OF FIDUCIARY DUTY.
 VI. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DIRECTING A VERDICT ON MR. SEMINATORE'S CLAIM OF PROMISSORY ESTOPPEL.
Civ.R. 50(A), which sets forth the grounds upon which a motion for directed verdict may be granted, states:
(A) Motion for directed verdict.
 (1) When made. A motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence.
 (2) When not granted. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts.
 (3) Grounds. A motion for a directed verdict shall state the specific grounds therefor.
 (4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
The trial court and this court are both governed by the same standard to decide whether a party is entitled to a directed verdict in a case.Zammit v. Soc. Natl. Bank (1996), 115 Ohio App.3d 543, 546,685 N.E.2d 850, 852.
A motion for directed verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion and that conclusion is adverse to such party. Civ.R. 50(A)(4); Crawfordv. Halkovics (1982), 1 Ohio St.3d 184; The Limited Stores, Inc. v. PanAmerican World Airways, Inc. (1992), 65 Ohio St.3d 66.
A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of this claim.Cooper v. Grace Baptist Church (1992), 81 Ohio App.3d 728, 734. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury and it constitutes a question of law, not one of fact. Hargrove v. Tanner (1990), 66 Ohio App.3d 693,695; Vosgerichian v. Mancini, Shah Associates, et al. (Feb. 29, 1996), Cuyahoga App. Nos. 68931 and 68943.
At trial it was stipulated that the parties stood in a fiduciary relationship to one another and that each owed fiduciary duties to the others. These duties included the obligation to use the utmost good faith and integrity in their dealings with one another in partnership affairs.McGrath v. Cowens (1898), 57 Ohio St. 385; Arpadi v. First MSP Corp.
(1994), 68 Ohio St.3d 453, 628 N.E.2d 1335. In Leigh v. Crescent Square,Ltd. (1992), 80 Ohio App.3d 231, the court expounded on the public policy rationale underlying the fiduciary duties owed between partners:
 Thus, several reasons exist for partners to owe each other fiduciary obligations. First, the duty of good faith deters competition between partners and the partnership. Additionally, it prevents partners from obtaining personal profit from confidential partnership information, as well as from participating in activities which are in direct conflict with the partnership's interests. Leigh, supra, at 237.
This court is aware of the reality that CCLG practiced law as a legal professional association, not as a general partnership. Nonetheless, the general partnership which was formed by the principals of CCLG at the firm's onset was never dissolved and, according to the testimony of John Climaco, was still actively utilized in the operation of much of the firm's day to day business. Additionally, the mere form by which the firm chose to operate did not operate to relieve individual shareholders of the traditional fiduciary duties, such as utmost good faith and integrity, imposed on attorneys practicing together as general partners.
The appellant's testimony, as well as the proffered testimony of Andrews, was sufficient such that reasonable minds could come to different conclusions as to whether there was a breach of fiduciary duty on the part of the appellees.
The doctrine of estoppel is based upon the premise that a party, by his or her conduct, has induced another to change position in good faith reliance upon that contract. Yackel v. Kay (1994), 95 Ohio App.3d 472,480, 642 N.E.2d 1107, Kosa v. Pruchinsky (1992), 82 Ohio App.3d 649,612 N.E.2d 1291. The promise of future benefits or opportunity, without a specific promise of continued employment, does not support a promissory estoppel exception to the employment at will doctrine. Wing v. AnchorMedia, Ltd. of Texas (1991), 59 Ohio St.3d 108.
The appellant testified that he was induced to forego opportunities to start his own firm or to succeed Burry as CEO of BC/BS by promises that he would retain his position with the firm even if BC/BS was lost as a client. The appellant testified to several conversations wherein he was specifically told by persons in management positions within CCLG that his status with the firm would not be adversely affected if BC/BS was lost as a client. Appellant stated that as a result of staying with the firm he incurred substantial financial losses. The proffered testimony of Andrews corroborates appellant's version of events as it relates to this count. Obviously, this court is aware that the testimony of the Climaco brothers and Anthony Garafoli squarely contradicts the appellant's testimony. These different accounts of events constitute genuine issues of material fact, making a directed verdict on these counts inappropriate.
While we expressly decline to comment on the merits of appellant's claim, the testimony of the appellant, together with the proffered testimony, are sufficient to establish an issue of fact. It cannot be said as a matter of law that a reasonable person reviewing the entirety of testimony and evidence adduced at trial could have only reached a conclusion that was adverse to the appellant and favorable to the appellees. Therefore, these assignments of error are sustained and the trial court's grant of directed verdicts on the appellant's claims for promissory estoppel and breach of fiduciary duty are reversed.
The appellant's fourth and fifth assignments of error, having a common basis in law and fact, will be addressed concurrently in this opinion. The appellant's fourth and fifth assignments of error state:
 IV. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DIRECTING A VERDICT ON MR. SEMINATORE'S CLAIM FOR BREACH OF THE NO CHANGE AGREEMENT.
 V. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DIRECTING A VERDICT ON MR. SEMINATORE'S CLAIM FOR BREACH OF HIS SEVERANCE AGREEMENT.
Both of these assignments of error relate to an agreement (or series of agreements) the appellant alleged to have existed between the shareholders of the CCLG which provided the following:
 a) that whenever any shareholder departed the corporation, for whatever reason, he would be automatically entitled to a severance payment in an amount equal to one-half of his prior year's total compensation.
 b) that no shareholder could have his compensation package altered in any manner without that shareholder's express approval.
The appellant admitted at trial that the agreements referenced in these assignments of error were oral agreements. At some point in time during the 1980's, the appellant attempted to change the corporate bylaws so that they would include these provisions, but, for whatever reason, his efforts to do so were not successful. Appellees John Climaco, Michael Climaco and Anthony Garafoli all strongly denied the existence of any such agreement or understanding in their testimony at trial.
In a case which involved the same law firm and nearly the identical issue as the present case, the Supreme Court of Ohio held that:
 Absent a provision in the articles of incorporation or in some extrinsic document (like a buy-sell agreement) requiring that a share or shares be redeemed, a legal professional association, formed pursuant to R.C. Chapter 1785, is not obligated to redeem the stock of a shareholder/employee who separates or is separated from his or her employment with the professional association.
Colaluca v. Climaco, Climaco, Seminatore, Lefkowitz Garafoli Co.,L.P.A. (1995), 72 Ohio St.3d 229, paragraph one of the syllabus. The court in Colaluca interpreted the language in R.C. 1701.23(A) requiring that shares be redeemed only by the express terms of such shares as a requirement that there be a written provision in the articles of incorporation or other extrinsic document permitting redemption. In the case sub judice, the one share of stock which was issued to appellant was issued with no express terms of redemption, nor is there any evidence of any extrinsic documents which were adopted by the corporation that would require that CCLG redeem appellant's share in the corporation.
Appellant, and the rest of the firm, were presumably well aware of the court's decision in Colaluca and its express terms requirement for redemption of stock in a legal professional association. The Colaluca
decision was decided nearly two years before the appellant became separated from CCLG. Had an informal agreement existed as to stock redemption between the shareholders prior to that time, appellant was put on notice with the release of the Colaluca decision that such an agreement needed to be reduced to writing to be enforceable.
Accordingly, these assignments of error are overruled.
The appellant's seventh assignment of error states:
 VII. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DISMISSING THE INDIVIDUAL DEFENDANT-APPELLEES, JOHN A. PECA, DENNIS WILCOX, AND PAUL LEFKOWITZ AT THE CLOSE OF MR. SEMINATORE'S CASE-IN-CHIEF.
The claims which were asserted against these defendants and which were directed out by the trial court included the promissory estoppel and breach of fiduciary duty claims. Additionally, the appellant asserted that he had individual contracts with these individuals to purchase his sweat equity in the corporation were he to leave CCLG for any reason.
The trial court properly dismissed all claims sounding in breach of contract and promissory estoppel pending against these defendants. There was no evidence at trial that the appellant ever entered into specific contracts, either oral or written, with any of these individuals or that any of these individuals ever made specific promises to the appellant upon which he relied to his detriment. During cross-examination, the appellant was asked to detail the nature of the contracts he entered into with each of these individuals. Although, the appellant maintained that such contracts did exist and that they were all identical to each other, he was unable to state with any specificity the time, the place or the details of each individual contract. The appellant was not able to testify to any specific conversations he had with any of these individuals concerning the issues of his alleged severance agreement. Therefore, as a matter of law, the appellant failed to establish the elements of contract and promissory estoppel against these individual defendants.
In our resolution of the appellant's third assignment of error, we concluded that genuine issues of fact remained in regards to the appellant's claim for breach of fiduciary duty. Since each of the individual appellees for whom the trial court directed a verdict at the close of the appellant's case was both a partner of the appellant's in the general partnership which continued to exist after the formation of the legal professional association and was a fellow shareholder in a closely held corporation, it is clear that each such individual had a fiduciary relationship with the appellant and that the appellant in turn owed fiduciary duties to each of them. Given the testimony of the appellant as well as the proffered testimony of Andrews, genuine issues of fact remained as to this claim and, accordingly, the trial court erred when it entered a directed verdict.
Therefore, this assignment of error is sustained, but only as it relates to the appellant's claim for breach of fiduciary duty against these individual appellees.
The appellant's eighth, and final, assignment of error states:
 VIII. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING MR. SEMINATORE'S MOTION IN LIMINE TO EXCLUDE ANY REFERENCE TO HIS SEALED MISDEMEANOR CONVICTION.
The appellant argues in this assignment of error that the trial court committed prejudicial error by denying his motion in limine to exclude any reference to his misdemeanor conviction for failure to accurately report honorarium fees paid to various lawmakers. The details of this conviction were outlined earlier in this opinion.
Evid.R. 609(C) provides:
 Evidence of a conviction is not admissible if the conviction has been the subject of a pardon, annulment, expungement, certificate or rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, and that person has not been convicted of a subsequent crime punishable by death or imprisonment in excess of one year * * *.
In State v. Wright (1990), 48 Ohio St.3d 5, 7, 548 N.E.2d 923, the Ohio Supreme Court held that Evid.R. 609 must be interpreted in a manner consistent with Evid.R. 403:
 [W]e find that Evid.R. 609 must be read in conjunction with Evid.R. 403. Thus, the trial court does possess broad discretion under Evid.R. 609 to determine the extent to which it will be allowed. The trial judge must weigh all the factors in making this determination. This holding is consistent with that reached in State v. Amburgey (1987), 33 Ohio St.3d 115, 515 N.E.2d 925, wherein the court stated that "[u]nder Evid.R. 609, a trial court has broad discretion to limit any questioning of a witness on cross-examination which asks more than the name of the crime, the time and place of conviction and the punishment imposed, when the conviction is admissible solely to impeach general credibility." Id. at the syllabus.
"It is the function of the trial court to weigh all relevant factors to determine the extent to which testimony of prior convictions will be admitted." State v. Robinson (Dec. 9, 1993), Cuyahoga App. No. 64112, unreported, citing State v. Wright, supra.
In the instant case, the trial court correctly determined that it would be impossible to provide context to the remarks made by the appellant at the sentencing in Franklin County if the appellees were precluded from making any reference to the appellant's conviction. The appellant was, of course, free to mitigate any damage that might be done by the mention of this minor misdemeanor conviction by pointing out that the record of the conviction was sealed, that the firm also plead guilty to a failure to properly report honorarium fees on the same day as the appellant entered his plea, that his violation of R.C. 101.71(C) was very technical in nature and that the Ohio Supreme Court ultimately determined that the indictment was defective because the charges were brought outside of the relevant statute of limitations period.
At trial, appellant's counsel was able to elicit testimony from appellee John Climaco that he, as well as most, if not all, of the other shareholders at the firm, believed that the prosecution of the appellant was personal and vindictive in nature and not warranted under existing law.
Therefore, any damage to the appellant's credibility by the referencing of his conviction in front of the jury was harmless.
This assignment of error is overruled.
Judgement is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
This cause is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.
Costs to be divided equally between plaintiff-appellant and defendants-appellees.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KILBANE, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE CONCURRING OPINION. KARPINSKI, P.J., CONCURS IN JUDGMENT ONLY AND DISSENTS IN PART WITH SEPARATE CONCURRING AND DISSENTING OPINION.
[1] In addition to named appellee Climaco, Climaco, Lefkowitz 
Garafoli Co., L.P.A., the other appellees are John Climaco, Michael Climaco, Paul Lefkowitz, Dennis Wilcox, John Peca and Anthony Garafoli. All of the individual appellees were shareholders in the Climaco, Climaco, Lefkowitz Garafoli legal professional association.
[2] The testimony at trial was that the number of shareholders changed as new attorneys were brought into the L.P.A. and other attorneys moved on from the firm. Additionally, the general partnership under which the law firm was initially organized was not dissolved upon the formation of the L.P.A., but, rather, continued on as an investment vehicle and a medium for other business purposes for members of the firm. For example, the testimony at trial was that much of the firm overhead continued to be paid by the general partnership well after the formation of the L.P.A.
[3] Medical Mutual became known as Blue Cross/Blue Shield of Ohio and, then, after the events which gave rise to the appellant's termination from CCLG, once again became known as Medical Mutual of Ohio.
[4] In addition to providing legal representation to BC/BS, the appellant claims to have furnished "marketing services" to the company. The issue of the characterization of these allegedly extra-legal services rendered by the appellant becomes relevant later in this case during the discussion of the $3,500,000 "non-compete" payment to the appellant called for as part of the transaction whereby Columbia Health Care Systems would acquire BC/BS.
[5] This court recently ruled on the enforceability of the agreement in response to an action brought by the appellant seeking payment under the terms of the contract. Seminatore v. Med. Mut. of Ohio (Feb. 17, 2000), Cuyahoga App. No. 75496, unreported. In Seminatore, supra, this court held that the appellant was not entitled to the proceeds of the agreement, as the agreement (if enforceable at all) clearly called for payments totaling $900,000 only in the event that appellant continued transitional legal representation of BC/BS as to existing matters.
It is interesting to note that although the appellant consistently refers to the contract/letter in question as a "severance agreement" throughout the course of these proceedings and stated that he intended to share the payments with the rest of CCLG once he was in receipt of the same, the record in the prior case shows that therein he characterized the identical payments as a personal "retirement plan."
[6] After the appellant was separated from CCLG, the firm collected on its outstanding bill to BC/BS, albeit at a significantly compromised amount.
[7] This period of time lasted at least from March 18, 1997 to March 27, 1997. The exact duration is unclear as the appellant's recall from this period at trial was "foggy."
[8] The messenger who delivered the letter was either or both Doug Andrews and/or Ralph Scoa, both attorneys with the firm. Appellant testified that he had a pre-arranged lunch with these two and asked one of them to drop it off at BC/BS headquarters on the way to lunch.
[9] Of the ten signatures, seven were signed for and initialed by Jack Maistros also a principal of the firm.
[10] The firm's conviction on these charges was ultimately reversed by the Ohio Supreme Court in State v. Climaco, Climaco, Seminatore, Lefkowitz Garafoli Co., L.P.A. on the grounds that the indictment was brought outside of the applicable statute of limitations period.
[11] This matter was heard and conferenced on July 6, 2000. A draft opinion was circulated on July 12, 2000. The majority received the concurring and dissenting opinion on November 17, 2000.
[12] Although it is not necessary in order to resolve this assignment of error for the court to make a determination as to whether Andrews was prohibited from testifying as to any matters which might have been a subject of his confidentiality agreement with CCLG, given the fact that appellant's attorney offered to stipulate that he would not ask any questions concerning the confidentiality agreement, this court is aware of no privilege which would have shielded Andrews from providing testimony on this issue.
[13] Although he remained a member of the Ohio State Bar Association at the time of trial, Duvall's license was on inactive status at the time of the trial.